**Michael HOLODNAK, Plaintiff,**

v.

**AVCO CORPORATION, AVCO–LYCOMING DIVISION, STRATFORD CONNECTICUT and Local 1010, United Auto Workers of America, Stratford, Connecticut, Defendants.**

Civ. A. No. B–15.

United States District Court,
D. Connecticut.

Aug. 15, 1974.

6. Five circuits have considered the question and it is true that they have reached divergent views.

Eugene N. Sosnoff, Sosnoff, Cooper & Whitney, New Haven, Conn., for plaintiff.

Robert J. Cooney and Edward Maum Sheehy, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., for defendant, Avco-Lycoming Div. of Avco Corp.

Daniel Shepro, Goldman & Rosen, Bridgeport, Conn., for defendant, Local 1010, United Auto Workers of America.

LUMBARD, Circuit Judge:*

Michael Holodnak brings this action against Avco-Lycoming Division of Avco Corporation and Local 1010 of the United Auto Workers of America, challenging his dismissal on May 28, 1969, for publishing an article critical of company and union practices. He claims $79,569.88 in damages with interest and counsel fees of $50,000.

In his first cause of action, Holodnak argues that the award of arbitrator Burton Turkus, upholding his discharge, should be vacated under § 10 of the Federal Arbitration Act, 9 U.S.C. § 10, be-

* Sitting by designation.

cause of the "evident partiality" of the arbitrator and because the arbitrator exceeded his power, principally by making an award in disregard of Holodnak's First Amendment rights.[1] In his second cause of action, Holodnak maintains that his discharge violated his contractual rights under the collective bargaining agreement, and he should therefore be reinstated and fully compensated for losses suffered, pursuant to § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. In his final cause of action, Holodnak asserts that Local 1010 breached its duty of fair representation, thereby entitling him to reinstatement and monetary damages, also under § 301 of the LMRA.[2]

Holodnak's allegations were substantially denied by both defendants, who also raised three special defenses: that the plaintiff had failed to state a claim upon which relief could be granted; that the suit was barred by the statute of limitations; and that, under the contract between Avco and Local 1010, the arbitrator's conclusion that there was "just cause" for Holodnak's discharge was final and binding.

On July 17, 1970, Judge Zampano denied motions by the defendants Avco and Local 1010 to dismiss. After discovery and a pre-trial conference, cross motions for summary judgment by the plaintiff and the defendant Avco were heard by Magistrate Latimer who recommended denial, which was so ordered by Judge Zampano. A two-day trial without a jury then commenced before this court on April 29, 1974.

## I.

On May 28, 1969, at approximately 9:30 a. m., Holodnak received a written notice that he was to report to Avco's labor relations office for a "disciplinary hearing." At 10 a. m., accompanied by his shop steward, Frank Guida, and committeeman Joe Mezick, Holodnak entered the labor relations office, where several management officials were present. William Ashlaw, a company representative showed Holodnak a copy of an article written by the plaintiff and published in the AIM Newsletter of May 15, 1969. The article is reproduced as an appendix to this opinion. The newsletter, a biweekly, was published in New Haven by the American Independent Movement, whose activities included running a candidate for Congress. The AIM Newsletter's circulation was approximately 750. There was no evidence concerning how many, if any, of Avco's employees received this publication.[3]

Ashlaw informed Holodnak that this article violated plant conduct rule 19 which provided:

> The below listed rules constitute prohibited conduct. Offenses under these rules may be cause for suspension or discharge.
>
> . . . . . .
>
> 19. Making false, vicious or malicious statements concerning any employee or which affect the employee's relation-

1. Holodnak also argues that the arbitrator exceeded his powers since the maximum allowable penalty for violation of the plant conduct rule which the plaintiff was accused of violating is a written warning. The plaintiff is mistaken in this as the plant conduct rules specifically provide for discharge. See p. 194 *infra*.

2. Courts of appeals, however, have made it clear that a suit against a union for breach of the duty of fair representation is not an action under § 301; rather, it is a breach of a duty implied from the grant to the union of exclusive power to represent employees of the collective bargaining unit in § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a). Jurisdiction is under 28 U.S.C. § 1337. See Retana v. Apartment, Motel, Hotel, & Elevator Operators, Local 14, 453 F.2d 1018, 1021–1022 (9th Cir. 1972); De Arroyo v. Sindicato de Trabajadores Packinghouse, 425 F.2d 281, 283 n. 1 (1st Cir.), *cert. denied*, 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed. 2d 114 (1970).

3. Holodnak did testify at the arbitration that he showed a copy of the article to a few employees at the plant.

ship to his job, his supervisors, or the Company's products, property, reputation, or good will in the community.[4]

Ashlaw read several paragraphs from the article aloud. The article, which was two printed pages, generally criticized both Avco and Union officials. Holodnak wrote that the "current course of moderation, charted by the Shop Committee, is alienating and frustrating the membership to no end." He accused the company, "like all large corporations," of engaging in "union busting tactics, which run the gamut from sweet talk, giving special privileges to company oriented candidates, . . . to making it miserable for and sometimes firing the really dedicated unionists, and last but not least, buying off whatever other effective opposition may be left with a foremanship." Turning then to the tactics which the workers might employ, the plaintiff noted that it is "probably true that wildcat strikes are not the answer, but wildcats wouldn't even be tempting if we had a good solid union that knows where it's at and that does not, through the grievance procedure, compromise away our rights. Yet it is comforting to have wildcats in our arsenal of weapons, just in case."

The process for resolving grievances came under particular attack. Holodnak wrote that "the company gets away with its devious and unfair labor practices because the company is above the law, (even the more naive realize this) and the biased judges and arbitrators, for all practical purposes, belong to the company. The most recent example was the firing of the twenty-two so-called 'hard core of miscreants.' From his Heavenly perch the 'impartial' Arbitrator, backing up the company, pronounced his God-like opinion upon us poor sinful mortals while praising the pure-as-the-snow 'patient company' to the high heavens."

Holodnak concluded by emphasizing "that nothing has ever been accomplished by so-called 'reasonable people' . . .

The labor movement itself would have never been born if the workers had been 'reasonable.' "

Ashlaw asked Holodnak whether he subscribed to the views expressed in the article and Holodnak said he did. Ashlaw then questioned a company security officer about the American Independent Movement and asked whether it was on the Attorney General's subversive list. The security officer answered that it was not. At the end of the meeting, despite a request by committeeman Joe Mezick to have a lesser charge carrying a reduced penalty brought against Holodnak, Ashlaw asked for Holodnak's badge and informed him that he was discharged. Holodnak had worked at the Avco plant for nine years, first as a tool-and-die maker and then as a small-parts inspector.

Following his discharge, the plaintiff contacted George Johnson, an attorney for AIM. It was agreed that Holodnak should permit the union to pursue the normal three-stage grievance procedure and then, if necessary, resort to arbitration. The grievance procedure proved unsuccessful and an arbitration hearing at the union's request was scheduled. Prior to this hearing, Holodnak asked that Edward Burstein, the attorney for Local 1010, represent him. Although union members were usually represented by a committeeman at arbitration proceedings, the union attorney did so from time to time. On July 8, 1969, Johnson, the AIM attorney who was advising Holodnak, spoke with Burstein on the phone and offered his assistance. Burstein expressed his pleasure at Johnson's offer, but never communicated with him again.

On July 17, 1969, the arbitration was held before arbitrator Burton Turkus at the Howard Johnson Motor Inn in West Haven, Connecticut. Here Burstein met the plaintiff for the first time. In the course of their ten or fifteen minute meeting, Burstein read the controversial article for the first time.

4. The plant conduct rules were incorporated by reference into the collective bargaining agreement, which allowed Avco to promulgate rules of conduct. Article XVI, § 4.

When the arbitration began, Burstein asked to be informed which rule Holodnak had been accused of violating.[5] After being informed, Burstein indicated Holodnak's right of free speech was at stake. But later when the arbitrator asked whether Holodnak would be attacking Plant Conduct Rule 19 on First Amendment grounds, Burstein agreed that rule 19 was a "fair and reasonable rule, regulation, policy requirement" and that the rule did not infringe on "the exercise of free speech."[6]

As the arbitration proceeded, the company representative, along with arbitrator Turkus, inquired into the plaintiff's political and social views as well as his personal background. He was asked about the books he read, the candidates he supported for political office, and his views on "corporatism." Most striking was the extent to which the arbitrator participated in this irrelevant and, at times, offensive questioning. Thus, at one point he asked Holodnak whether he had travelled to Cuba in 1960 and had written articles based on his experiences and his views of the "Castro system." He questioned Holodnak repeatedly about his motives for writing the article which had led to his discharge.

Emphasis throughout the proceeding seemed to be on instructing Holodnak on the mistake of his ways. At one point the arbitrator told him, referring to Holodnak's comments suggesting that the union was not doing all that it might, "[N]ow you know differently, don't you." At another point, the arbitrator instructed him:

> "Well, don't you know, as a fact, when you wrote the article, that you have here a very militant and zealous union that seeks the protection of the rights of its membership and seeks to endorse (sic) all Company obligations under the contract. Didn't you know that when you wrote the article?"

Throughout this line of questioning the union attorney made no objection. Indeed, the record of the arbitration reveals only the most half-hearted efforts on his part to object to the irrelevant and improper statements made by the arbitrator and the counsel for Avco.

Testimony at the trial revealed that Holodnak's article was less vituperative and critical of company and union practices than numerous other articles and leaflets, many of which had been distributed at the plant by the union. These leaflets included descriptions of company officials as "the Mickey Mouse managers of Stratford's Disneyland" with "a superb talent for being both inconsistent and incompetent." The supervision at the plant is described in one circular as "the political cesspool of mahogany row" that "has no regard for human dignity." General foremen are depicted as "brainless" and the grievance proceedings as a

---

5. At the arbitration, plaintiff indicated that he was satisfied to have Edward Burstein representing him and that he had discussed his grievance with Burstein. At trial, Holodnak indicated that he did not realize at the time the degree to which Burstein inadequately represented him. There is no reason to consider his comments at the arbitration in any way binding.

6. Both the Company and the union claim that Burstein's statements are inadmissible because of Conn.Gen.Stat. § 52–172, which allows the declarations of a deceased to be admitted in actions by or against the estate of the deceased. Since Burstein has since died and his estate is not a party to this action, it is claimed that his statements are not admissible in any other proceeding. Section 52–172, however, was intended to do away with the rule that a party was disqualified to testify in an action against the deceased's estate. See generally, C. McCormick, Evidence § 65 (2d ed. 1972). This section, recommended by the ABA in 1938 as a model, id. at 144 n. 32, certainly was not intended to bar testimony where there had been no bar previously. Antedomenico v. Antedomenico, 142 Conn. 558, 115 A.2d 659 (1955), and Mooney v. Mooney, 80 Conn. 446, 68 A. 985 (1908), cited by the union, merely stand for the proposition that § 52–172 does not allow the admission of otherwise inadmissible hearsay. Here there is no reason not to consider Burstein's comments as recorded at the arbitration proceeding and his brief on Holodnak's behalf.

In any event, this court is not necessarily bound by Connecticut rules of evidence. See Fed.R.Civ.P. 43(a).

"weekly farce." Two union officials who testified at trial, Frank Guida and Joe Mezick, made clear that Holodnak's article was not nearly as harsh in its criticisms as much of the material circulated among workers at the plant.

After the conclusion of the arbitration hearing, the parties submitted post-arbitration briefs. The brief submitted by attorney Burstein on behalf of Holodnak was harsh in its characterization of Holodnak. Holodnak was described as "politically conscious to an inordinate degree." It stated that: "It is said, 'A little knowledge is a dangerous thing', and so it is with Michael Holodnak—that which he knows is but a scintilla of what he doesn't know!" Then Burstein repudiated much of Holodnak's testimony at the arbitration: "Testimony throughout is replete with examples of this man's superficial knowledge, which because it was gleaned informally, if oftimes wrong and even childlike in its naivete." Burstein "respectfully submitted that grievant really knew not what he was doing . . . and that the arbitrator should consider this in making his decision as to whether the termination was proper and just." Burstein then argued only briefly that there was no evidence that Holodnak's comments had been false, vicious, or malicious and that the company had waived any right to discharge an employee for violation of rule 19.

Pursuant to Article V, § 1.a. of the collective bargaining agreement then in force, which gave Avco the right to discharge for "just cause," arbitrator Turkus, on December 18, 1969, rendered a one-sentence award which stated that the proof "establishes the just cause for the discharge . . . with conclusive finality." Article IV, § 1.b. of the collective bargaining agreement further provided that the "decision of the *Arbitrator* shall be final and binding."

At the time of the plaintiff's discharge, the Avco plant in Stratford was owned by the government, as was virtually all the machinery and the land upon which it was located. Military personnel were present at all times to guarantee quality control of the plant's output. Eighty percent of the production of the plant was in the form of military hardware: nose cones for missiles, helicopter engines, and constant speed drives for fighter planes. The plant in Stratford as well as one in South Carolina is part of the Avco-Lycoming Division of the Avco Corporation, a widely diversified conglomerate.

## II.

Following the award of the arbitrator, Holodnak commenced this action by the filing of a complaint in the district court on February 16, 1970. The complaint, however, was not served forthwith, largely due to an overload of business in the United States Marshal's office. When notified that a marshal would not be available to serve the process immediately, the plaintiff moved to allow service by an indifferent person. This motion was granted on February 18, 1970, and service was effected on Monday, February 23, 1970, three months and one day after the filing of the arbitration award.

Section 12 of the Arbitration Act, 9 U.S.C. § 12, provides that:

> "Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered."

On the basis of this statute, the defendants argue that the plaintiff's action to have the arbitrator's award vacated is time barred by the statute of limitations since service of process was effectuated one day late. Both Judge Zampano, in his denial of defendants' motion to dismiss, and Magistrate Latimer, in his denial of defendant Avco's motion for summary judgment, rejected this argument, emphasizing the due diligence of the plaintiff in securing a substitute means to perfect service within the time limit and the absence of any prejudice suffered by the defendants as a result of the one day delay. The court agrees that the circumstances of the service do not represent a bar to this action. See

American Guaranty Co. v. Caldwell, 72 F.2d 209, 212 (9th Cir. 1934). Moreover, under the Federal Rules of Civil Procedure, Rule 6(a), when the last day of the limitations period falls on a Sunday, as was the case here, the period is extended until the end of the following day. While the Arbitration Act contains no such provision, the policy of liberality embodied in Fed.R.Civ.P. 6(a) should be applied by analogy. See Union National Bank v. Lamb, 337 U.S. 38, 69 S.Ct. 911, 93 L.Ed. 1190 (1949); Wirtz v. Local Union 611, 229 F.Supp. 230 (D.Conn.1964); Rutledge v. Sinclair Refining Co., 13 F.R.D. 477 (S.D.N.Y.1953).

### III.

■ The next question is whether the arbitrator's award, "final and binding" under the collective bargaining agreement, may be vacated by this court.[7]

In his first cause of action, Holodnak seeks to vacate the arbitrator's award pursuant to 9 U.S.C. § 10. One of the grounds urged for setting aside the award is the arbitrator's "evident partiality." It is settled that upon judicial review of an arbitrator's award, "the court's function in . . . vacating an arbitration award is severely limited," Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., 274 F.2d 805, 808 (2d Cir.), cert. denied, 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727 (1960), and is confined to determining whether one of the grounds for vacation specified in 9 U.S.C. § 10 is available, Office of Supply, Republic of Korea v. New York Navigation Co., 469 F.2d 377 (2d Cir. 1972). One such ground is the arbitrator's partiality.

"[W]hen a claim of partiality is made, the court is under an obligation to scan the record to see if it demonstrates 'evident partiality' on the part of the arbitrators." Saxis Steamship Co. v. Multifacs

International Traders, Inc., 375 F.2d 577, 582 (2d Cir. 1967); Ballantine Books, Inc. v. Capital Distributing Co., 302 F.2d 17 (2d Cir. 1962). The transcript of the arbitration here discloses substantial evidence of partiality on the part of the arbitrator, if not open hostility toward the plaintiff. Throughout the proceeding, the arbitrator permitted inquiries to be made into the books Holodnak read, his political views, and his personal background. The arbitrator himself participated in questioning the plaintiff about a trip to Cuba in 1960 and his views on Castroism. Repeatedly, he showed an undue concern for the plaintiff's motives in writing the article published in the AIM Newsletter and what Holodnak was trying to "signal" to his readers. Indeed, at times the arbitrator openly badgered the plaintiff, as when he persistently questioned Holodnak about his statement that "reasonableness" on the part of workers in pressing their demands might not be the best way to achieve their goals. This line of questioning culminated with an exchange:

(Arbitrator): Well, it was the general tenor and purport of the article to indicate that the Union officials of this Union were supine and were not doing the job that they were supposed to do. Isn't that the whole purpose of your article?

(Holodnak): Well, at that time I thought that was true, that they weren't quite doing the job.

(Arbitrator): But now you know differently, don't you?

Later the arbitrator took issue with Holodnak's view that the union should be more aggressive in handling grievances:

(Arbitrator): Well, don't you know, as a fact, when you wrote this article, that you have here a very militant and zealous union that seeks the protection of rights of its membership and seeks

7. Both the plaintiff and the defendants assume that the provisions of the Federal Arbitration Act are applicable to this labor arbitration. While there has been considerable debate on whether the Act applies to labor arbitration, the Second Circuit is of the view that it does. *See* Bell Aerospace Co. v. Local 516, UAW, 500 F.2d 921 (2d Cir. 1974); International Assn. of Machinists v. General Electric Co., 406 F.2d 1046, 1049–1050 (2d Cir. 1969).

to endorse (sic) all Company obligations under the contract? Didn't you know that when you wrote the article? (Holodnak): Well, I didn't say that they didn't enforce it. I'm pointing out the shortcoming here. I know there are some good things they do, a lot of good things.

(Arbitrator): Well, certainly when you wrote this article, you knew that there was no shortcoming, that this was not a supine Union that sat by and allowed the Company to do whatever it wanted; you knew that when you wrote it."

The arbitrator seemed compelled to convince Holodnak that he was wrong in criticizing the grievance system to which the arbitrator himself had been appointed as the permanent umpire.

✓ The clear bias revealed by the arbitrator's comments throughout the arbitration proceeding requires that the award be vacated. 9 U.S.C. § 10.

## IV.

■■ Because the plaintiff seeks not only vacation of the arbitrator's award, but also reinstatement and damages, his claims under § 301 of the LMRA, 29 U.S.C. § 185, must be considered. Section 301 provides for private suits for violation of collective bargaining agreements. The right to bring suit is not restricted to the representative union, but may be exercised by an employee in his own behalf. Smith v. Evening News Association, 371 U.S. 195, 200–201, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). Here there is no problem of a failure to exhaust grievance and arbitration procedures, since Holodnak has pursued fully the recourse provided in the collective bargaining agreement. Such procedures having been exhausted, the plaintiff may properly seek relief for breach of contract under the collective bargaining agreement pursuant to § 301 of the LMRA. See Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).

■ Ordinarily, an employee may not challenge in the courts the decision of an arbitrator where based on an interpretation of the collective bargaining agreement following a fair hearing of his grievance. United Steel-Workers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 598–599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). However, where the union has failed to provide him with fair representation in the course of the grievance or arbitration process, the arbitrator's award is not binding on the employee and he may maintain an action under § 301 of the LMRA against the employer and the union. Vaca v. Sipes, 386 U.S. 171, 184–186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The reason is that the employee's grievance can hardly have been given due consideration by the arbitrator when it was not fairly presented by his representative union. *Id.* at 185, 87 S.Ct. 903.[8] Here there can be little question that Holodnak was not fairly represented at the arbitration by his union's attorney, Edward Burstein.

In Vaca v. Sipes, Mr. Justice White said, "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." 386 U.S. at 190, 87 S.Ct. at 916. It is clear that the union's representation of Holodnak constitutes a breach of the

8. In *Margetta v. Pam Pam Corp.*, 354 F. Supp. 158 (N.D.Cal.1973), the district court held that the reasoning of Vaca v. Sipes, *supra*, did not apply to cases in which the grievant had actually exhausted all the remedies provided by the collective bargaining agreement and then claimed that he had been unfairly represented. The court rejects this view. The clear import of *Vaca* is that the grievant must be afforded meaningful representation and denial of such representation requires that the grievant be permitted an opportunity to bring his own action in the district court. *See* Griffin v. UAW, 469 F.2d 181 (4th Cir. 1972); Andrus v. Convoy Co., 480 F.2d 604, 606 (9th Cir.), cert. denied, 414 U.S. 989, 94 S.Ct. 286, 38 L.Ed.2d 228 (1973); Harris v. Chemical Leaman Tank Lines, Inc., 437 F.2d 167, 171 (5th Cir. 1971).

duty of fair representation. The harsh and unfair description of Holodnak contained in Burstein's brief is at best a misguided attempt to plead for mercy from the arbitrator, cf. Bazarte v. United Transportation Union, 429 F.2d 868 (3d Cir. 1970), and is at worst an indication of the union's bad faith. This need not be decided since the union breached its duty of fair representation because of the perfunctory manner in which the union handled the arbitration. See Vaca, *supra*, 386 U.S. at 191, 87 S.Ct. 903.

Although the Second Circuit has not yet passed upon the point, see, *e. g.*, Pyzynski v. New York Cent. R. R., 421 F.2d 854 (2d Cir. 1970), other courts of appeals have held that arbitrary conduct in handling a meritorious grievance in a perfunctory manner is a breach of the duty of fair representation.[9] See Griffin v. UAW, *supra*, 469 F.2d at 182–183; Retana v. Elevator Operators, *supra*, 453 F.2d at 1024 n. 10; De Arroyo v. Sindicato de Trabajadores Packinghouse, *supra*, 425 F.2d at 283–284. See generally Clark, *supra* note 9. There is little doubt that Burstein represented Holodnak in a perfunctory manner. Although he recognized that important free speech rights were involved, he conceded, probably because of inadequate preparation, that rule 19, which is certainly vague and easily susceptible to an overbroad interpretation, was reasonable. Although the collective bargaining agreement did give the company the right to promulgate rules of conduct, Burstein should have argued that the parties to the agreement did not intend to allow dismissal for conduct such as Holodnak's.[10] Burstein should have emphasized the important free speech considerations and demanded that rule 19 be strictly construed so that it was at least limited to situations in which the false, vicious or malicious statements concerned any *particular* employee or situations in which the statements were *proved* to have affected the employee's relationship to his job or the company's reputation in the community. Finally, Burstein made no effort to distinguish what might be considered to be factual statements in Holodnak's article from statements of opinion and rhetorical hyperbole. Indicative of this passive approach by Burstein is the minimal effort on his part to object when the arbitration proceeding became an inquisition into Holodnak's beliefs.

The union was not faced with the task of balancing the interests of one set of employees it represents with another. Holodnak's right was the right of all its members to express their views on labor-management relations. Under these circumstances, the court must hold that the union's representation of Hol-

9. The description of the duty of fair representation contained in Amalgamated Association of Street Employees v. Lockridge, 403 U.S. 274, 301, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), which emphasized bad faith, does not change this conclusion. That case was concerned with pre-emption of a claim by the National Labor Relations Board and gave no indication that it intended to change the duty of fair representation as stated in *Vaca*. See Clark, The Duty of Fair Representation: A Theoretical Structure, 51 Texas L.Rev. 1119, 1126 (1973).

NLRB pre-emption of Holodnak's claims is no problem here. While the company's dismissal of him is arguably an unfair labor practice, see NLRB v. Nu-Car Carriers, Inc., 189 F.2d 756, 760 (2d Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952), Holodnak may nonetheless sue under § 301, see Smith v. Evening News Assn., *supra*. Likewise, while the union's breach of its duty of fair representation may be an unfair labor practice, see NLRB v. Miranda Fuel Co., 326 F.2d 172 (2d Cir. 1963), Holodnak may still sue the union in district court for the breach. See Vaca v. Sipes, *supra*.

10. It is now clear that a union cannot bargain away its members' rights under § 7 of the National Labor Relations Act, 29 U.S.C. § 157, to distribute pro- or anti-union literature in the plant so long as production or discipline is not disturbed. NLRB v. Magnavox Co., 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974). If Holodnak's conduct was protected by § 7, see note 9 *supra*, then presumably the union here could not validly agree to any infringement of his rights. This, of course, would be a matter for determination, in the first instance, by the NLRB.

odnak was sadly lacking and was arbitrary.

## V.

Even though the union failed in its duty to provide fair representation, the question remains whether Holodnak has a meritorious claim under § 301 of the LMRA.

The crux of Holodnak's § 301 claim is that his discharge by Avco was in breach of Article V, Section 1 of the Collective Bargaining Agreement of April 16, 1967, between the company and the union, which provided that "The Company shall have the right to discharge or discipline employees for just cause." Holodnak maintains that his discharge was not for "just cause" since it was due to his exercising of his First Amendment rights by authorship of the article published in the AIM Newsletter.

In determining whether Holodnak was fired without "just cause" this court must take due account of Holodnak's First Amendment rights. See Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). There is no doubt that Holodnak was discharged because of what he wrote in the article. If Holodnak's dismissal infringed his First Amendment rights, the court must hold his discharge was without "just cause" and Avco breached the collective bargaining agreement.

The First Amendment is a protection against governmental infringement of speech. There is no First Amendment protection, however, from infringement by a private employer. NLRB v. Edward G. Budd Mfg. Co., 169 F.2d 571, 577 (6th Cir. 1948), cert. denied, 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441 (1949); cf. Buckley v. American Fed. of Television & Radio Artists, 496 F.2d 305 (2d Cir. 1974).

The parties here have disputed whether the links between Avco and the federal government are so substantial as to provide the requisite degree of governmental action to enable Holodnak to challenge his discharge on First Amendment grounds. The evidence adduced at trial reveals that Avco is a major defense contractor. Beverly Warren, Avco vice president and chief operating officer at the Stratford plant, testified that approximately 80% of the work done at the plant at the time of the plaintiff's discharge was defense-related and primarily directed toward producing aircraft engines, missile nose cones, and constant speed drives for the military. Nearly all the land, buildings, machinery, and equipment at the Stratford plant were owned by the government. The Department of Defense maintained a large task force at the plant to oversee operations, assure contract compliance and guarantee quality control.

The question of how much government involvement constitutes "state action" does not lend itself to a simple answer. Rather, as the Supreme Court emphasized in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the task is one of "sifting facts and weighing circumstances," id. at 722, 81 S.Ct. 856, a procedure, which as Judge Friendly has recently noted, "has survived much better than attempts at more definitive formulations." Wahba v. New York University, 492 F.2d 96, 101–102 (2d Cir. 1974).

In the Burton case, a restaurant located in an automobile parking building had refused to serve a customer because of his race. The building in which the restaurant was located was owned by the State of Delaware with the restaurant as a lessee. Reversing the Supreme Court of Delaware and holding that there was "state action," the Supreme Court emphasized that the land and building were publicly owned, the cost of land acquisitions, construction, and maintenance had been defrayed by public funds, and the restaurant was an "indispensable part of the State's plan to operate its project as a self-sustaining unit," 365 U.S. at 723–724, 81 S.Ct. at 861. Many of these same factors are present here. Not only were the land, buildings,

and equipment all owned by the government, but the production at the plant was almost entirely for the military.

Wahba v. New York University, *supra*, on which *Avco* relies is clearly distinguishable on its facts. As the court of appeals stressed, "decisions dealing with one form of state involvement and a particular provision of the Bill of Rights [are not] at all determinative in passing upon claims concerning different forms of government involvement and other constitutional guarantees." 492 F.2d at 100.

Here we are concerned with substantial governmental involvement at Avco's Stratford plant. The fact that Avco-Lycoming Division also operated a second plant in South Carolina engaged in other production and is part of a far-flung conglomerate does not alter the conclusion that there is governmental action. The right here involves the basic right of freedom of speech and press and the firing of Holodnak for expressing his views is "offensive." See *Wahba, supra,* 492 F.2d at 102. For present purposes, the court concludes that there was sufficient governmental action for the First Amendment to apply.

■ In light of this governmental presence, the plaintiff's discharge for writing an article must be analyzed to determine if First Amendment rights have been infringed. The First Amendment does not guarantee an absolute right of free speech. Concerning discharges of public employees, the Supreme Court has held that the interest of the employee in free speech must be balanced against the employer's interest in job efficiency. Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). See also Linn v. Plant Guards, Local 114, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1963).

Both the company and the union claim that precedents have already resolved this balance adversely to Holodnak. The company places particular emphasis on the Supreme Court's decision in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). While in *Arnett* the court upheld the discharge of a civil service employee pursuant to a statute authorizing discharges of civil servants for "such cause as will promote the efficiency of the service," 5 U.S.C. § 7501 (1970), it made clear that it was only deciding that the statute was not overbroad on its face. Noting that the statute did not reach "constitutionally protected speech," the plurality opinion by Mr. Justice Rehnquist placed particular emphasis on the fact that the discharged employee had not been discharged for protected speech, but for making recklessly false and defamatory statements that another civil servant, whom he had named, had taken a bribe.

The union relies on cases upholding discharges of teachers who made statements which were potentially disruptive of classroom activities. See, *e. g.*, Birdwell v. Hazelwood School District, 352 F.Supp. 613 (E.D.Mo.1972), aff'd, 491 F.2d 490 (8th Cir. 1974).

The situation here is markedly different from both *Arnett* and *Birdwell.* Unlike Arnett Holodnak never accused anyone of illegal activity and has not identified those individuals who, he believed, had not acted in the best interests of the workers. Indeed throughout the grievance and arbitration proceedings Holodnak has evidenced great reluctance to disclose the identities of those he had in mind in writing the article. In no way can Holodnak's comments, constitutionally speaking, be said to be of and concerning any particular individual. New York Times Co. v. Sullivan, 376 U.S. 254, 288–292, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

Unlike *Birdwell*, relied on by the union, we do not have here potentially disruptive speech in the refined atmosphere of a classroom but rather speech in the rough-and-tumble of labor relations. The record in this case indicates that Holodnak's article was no more harsh in its descriptions of management than the union's own leaflets. *See* generally Linn v. Plant Guards, Local 114, *supra,* 383 U.S. at 58, 86 S.Ct. 657. From this rec-

ord, the court concludes that use of vituperatives alone, such as at issue here, could not have interfered with production at Avco.

Since the cases cited by defendants are not in point, the court must balance the competing interests as suggested in *Pickering*. Read fairly, Holodnak's article is an analysis of why unions lose their militancy. It is largely composed of Holodnak's opinions concerning labor-management relations at Avco and as such is a matter of employee interest clearly protected.[11] Furthermore, many of the statements in the article that could be read as statements of facts are more reasonably read as rhetorical hyperbole, and as such are constitutionally protected. Greenbelt Cooperative Publishing Assn. v. Bresler, 398 U.S. 6, 11–14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *cf.* Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). Finally, as noted above, none of the statements concerned any particular person. Thus it must be concluded that Holodnak's article was constitutionally protected regardless of the truth or falsity of the few statements of facts in it. See generally Gertz v. Robert Welch, Inc., *supra*; New York Times Co. v. Sullivan, *supra.*

Against Holodnak's interest in having his say, Avco's interest in maintaining efficiency in production is insufficient. As noted above, vituperative articles such as Holodnak's were quite common at Avco and evidently they have not interfered with production. Avco strongly argues that Holodnak's article favored wildcat strikes, which were a problem at Stratford. But the article in fact questions the effectiveness of such strikes and does not advocate them. While Holodnak's belief, expressed at the arbitration hearing, that workers had a constitutional right to engage in a wildcat strike was mistaken, see Boys Markets, Inc. v. Retail Clerks, Local 770, 398 U.S.

235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), his article falls far short of being "incitement to imminent lawless action." Brandenburg v. Ohio, 395 U.S. 444, 449, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

The balance, therefore, clearly tips in favor of Holodnak's right to free speech. It is noteworthy that even in private enterprise where the guarantees of the First Amendment do not apply, federal statutes have given employees the right to speak their minds on labor relations. Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, gives employees the "right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." Interference with these rights by an employer is an unfair labor practice. 29 U.S.C. § 158(a)(1). Only recently in NLRB v. Magnavox Co., *supra,* 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358, the Supreme Court upheld a finding of an unfair labor practice where a company rule forbade the distribution of pro- and anti-union literature within the plant, even though the collective bargaining agreement authorized the rule. See also Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). Of course, the question of whether Holodnak's discharge is an unfair labor practice is not for a district court to decide. See notes 9 & 10, *supra.* But *Magnavox* by analogy supports the conclusion that the First Amendment can allow no greater restrictions by a public employer on the right of employees to write articles which are circulated outside the plant and which in no way interfere with production.

Moreover, Congress has shown its interest in ensuring the right of employees to speak out on matters of union representation in § 101(a)(2) of the Labor-

---

11. "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974).

Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(2), which provides: "Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments or opinions . . . ."

While this statute is principally concerned with preserving the right of the worker to speak out on union matters without being punished by the union, it clearly evidences a concern by Congress that the worker should be free to speak his mind on the important question of the quality of representation he is receiving. This is precisely what Holodnak sought to do. *Cf.* Cole v. Hall, 462 F.2d 777 (2d Cir. 1972), aff'd, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 782 (1973).

In light of the foregoing, the court must conclude that Avco's dismissal of Holodnak infringed on his First Amendment rights and that Holodnak was not discharged for "just cause" as required by Article V, § 1.a. of the collective bargaining agreement.[12]

In conclusion, we would do well to remember what the Supreme Court said 34 years ago in Thornhill v. Alabama, 310 U.S. 88, 103, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940): "Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society."

## VI.

Attached to plaintiff's post-trial memorandum is a revised financial loss statement. In addition to seeking reinstatement, plaintiff claims $49,569.88 in back wages. The plaintiff also seeks $30,000 in punitive damages for wilful discharge. Finally, $50,000 in attorney fees are requested.

■ Holodnak is entitled to $9,113.24 in back pay. At trial, he was unable to offer any evidence that he had sought equivalent employment during the last four years. He frankly conceded that he had not looked for employment, although he was a skilled laborer, and had relied to some extent on a disability pension. Only during the first year after being discharged did he make any effort to obtain other employment. Holodnak was under a duty to mitigate damages. Schneider v. Electric Auto-Lite Co., 456 F.2d 366, 373 (6th Cir. 1972); De Arroyo v. Sindicato de Trabajadores Packinghouse, *supra,* 425 F.2d at 292; *cf.* N. L. R. B. v. Mastro Plastics Corp., 354 F.2d 170, 178 (2d Cir. 1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L. Ed.2d 682 (1966). Accordingly, damages for back pay are awarded only to

---

12. This resolution makes unnecessary the determination of other issues presented here. Although Holodnak did not state as one of his claims the denial of his constitutional rights, this theme ran throughout the trial and the post-trial briefs. Reliance on the First Amendment rather than LMRA § 301 and 9 U.S.C. § 10 as a basis for his claims would presumably require resolution of the issue of whether the rationale of Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which allowed damage actions to remedy violations of the Fourth Amendment, extends to actions charging violations of the First Amendment. See Wahba v. New York University, *supra,* 492 F.2d at 103–104. The court expresses no views on this question, as well as the question of whether an action under the First Amendment can be used to bypass the tight restrictions on judicial review of a labor arbitrator's award. See generally Alexander v. Gardner-

Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

It is also unnecessary to consider other possible grounds for vacating the arbitration award and granting Holodnak relief. One of these would be to hold that since the arbitrator is an instrument of national labor policy, he is not a mere "private" person, but rather one acting on behalf of the government who must take into account First Amendment rights. *Cf.* Buckley v. AFTRA, *supra,* 496 F.2d at 309–310. Closely related to this is the argument that the labor laws express a public policy encouraging free association and communication among employees and that courts are free to review and vacate an arbitration award which conflicts with that policy. *Cf.* Local 453, Electrical Workers v. Otis Elevator Co., 314 F.2d 25 (2d Cir.), cert. denied, 373 U.S. 949, 83 S.Ct. 1680, 10 L.Ed.2d 705 (1963).

the extent of $9,113.24. This figure is comprised of $7,012.40 for normal hours worked and $2,101.84 for overtime from May 29, 1969 to April 14, 1970, as a small-parts inspector *A*. The union was on strike for the remainder of the year following discharge. Interest is awarded on this amount at a rate of 6% from the date of judgment. No pre-judgment interest is awarded. Lodge 743 v. United Aircraft Corp., 336 F.Supp. 811, 815 (D.Conn.1971).

As to the apportionment of damages between Avco and Local 1010, Vaca v. Sipes, *supra*, makes clear that damages should be apportioned according to fault. "[D]amages attributable solely to the employer's breach of contract should not be charged to the union." 386 U.S. at 197, 87 S.Ct. at 920. *See also* De Arroyo v. Sindicato de Trabajadores Packinghouse, *supra*; Richardson v. Communications Workers, 443 F.2d 974 (8th Cir. 1971). Since essentially all the loss suffered here was due to Avco's improper discharge of the plaintiff, it must be held liable for plaintiff's back pay and interest thereon.

Holodnak also seeks $30,000 in punitive damages. Whether such damages are recoverable under LMRA § 301 is still an open question. A closely divided Third Circuit has held that punitive damages are not available under § 301 and the Ninth Circuit apparently agrees. Local 127, Shoe Workers v. Brooks Shoe Manufacturing Co., 298 F.2d 277 (3d Cir. 1962) (en banc); Williams v. Pacific Maritime Assn., 421 F.2d 1287 (9th Cir. 1970). Two district courts, however, have said that punitive damages may be available under § 301. Zamora v. Massey-Ferguson, Inc., 336 F.Supp. 588 (S.D.Iowa 1972); Patrick v. I. D. Packing Co., 308 F.Supp. 821 (S.D.Iowa 1969); Sidney Wanzer & Sons, Inc. v. Milk Drivers, Local 753, 249 F.Supp. 664 (N.D.Ill.1966). In the context of other statutory provisions, the Supreme Court has held that the NLRB does not have the power to impose punitive damages, Republic Steel Corp. v. NLRB, 311 U.S.

7, 61 S.Ct. 77, 85 L.Ed. 6 (1940), and that punitive damages are not available under LMRA § 303(b), 29 U.S.C. § 187(b), which allows a person injured by unlawful secondary boycotts to recover the "damages by him sustained and the costs of the suit." Local 20, Teamsters v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964).

The determination of whether punitive damages are available is, of course, a question of federal law. Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). The language of § 301, which only gives the district courts jurisdiction over suits for violation of collective bargaining agreements, does not provide the answer. Two justifications have been given for allowing punitive damages. One is that such damages may be awarded in special instances to further the policy of federal labor laws when other remedies may be lacking. Sidney Wanzer & Sons, *supra*, 249 F. Supp. at 668–671. The other is that while punitive damages are not normally available in contract actions, they are when an independent right apart from plaintiff's contractual rights has been infringed. Local 127, Shoe Workers v. Brooks Shoe, *supra*, 298 F.2d at 282–283 (Staley, J., dissenting on this point).

The justification given in *Wanzer* is doubtful given the sweeping rejection of a deterrence as a rationale for penalties in Republic Steel Corp. v. NLRB, *supra*, 311 U.S. at 12, 61 S.Ct. 77, even though *Wanzer* attempted to distinguish that case. This matter need not be decided here since there is no evidence that punitive damages are necessary to deter future violations by Avco.

The rationale of the *Brooks Shoe* dissent is more in point and is more persuasive. Generally in contract cases punitive damages are available when the defendant's actions might also be tortious. See 5 A. Corbin, Contracts § 1077 (1964). There is no reason to believe that the district courts cannot apply general contract principles in § 301 actions where such principles are consistent with

federal labor law policies. See Textile Workers v. Lincoln Mills, *supra*, 353 U.S. at 457, 77 S.Ct. 912. Unlike the NLRB, with which the Supreme Court was concerned in *Republic Steel*, the federal courts are not administrative agencies with limited expertise but are forums that often balance a wide range of concerns in rendering decisions.

Here Avco acted in a manner that interfered with Holodnak's rights under the First Amendment and the federal labor laws. As noted above, no substantial explanation for the discharge can be given. Avco's actions must be either viewed as an irrational reaction to the article or as a calculated attempt to remove an employee who was considered to be a trouble maker. In either event, such wilful behavior, contrary as it is to the policies of the Constitution and federal law, cannot be tolerated. Punitive damages are damages available in civil rights actions for gross disregard of rights. See, *e. g.,* Lee v. Southern Home Sites Corp., 429 F.2d 290, 294 (5th Cir. 1970); Chubbs v. City of New York, 324 F.Supp. 1183, 1191 (E.D.N.Y.1971); Stamps v. Detroit Edison Corp., 365 F.Supp. 87, 119, 124 (E.D.Mich.1973). Since Avco has acted wilfully in a manner that violated Holodnak's constitutional and statutory rights, the court holds that punitive damages are available and that the award to Holodnak of $10,000 in such damages from Avco is appropriate.

 Plaintiff also seeks reinstatement at his former job at Avco. While reinstatement is a proper remedy in some circumstances, see De Arroyo v. Sindicato de Trabajadores Packinghouse, *supra,* 425 F.2d at 292, the court does not feel that this remedy is appropriate here. Holodnak's failure to seek work for several years casts doubt upon his contention that he is willing in good faith to return to work. Moreover, Holodnak's physical condition, observed at trial, makes it doubtful that he is physically capable of returning to doing the work he had been doing. In short, in the absence of any showing that Holodnak is now capable of doing the work he had

been doing, in light of his failure to attempt to secure employment, there is no basis for ordering his reinstatement.

 As for plaintiff's request for counsel fees, this is generally a matter reserved to the discretion of the court. De Arroyo v. Sindicato de Trabajadores Packinghouse, *supra,* 425 F.2d at 292–293 (1st Cir. 1970); Local 4076, United Steelworkers of America, AFL–CIO, 338 F.Supp. 1154 (W.D.Pa.1972). The court has power to award counsel fees despite the absence of express statutory authorization. *Cf.* Cole v. Hall, *supra.* As in *Cole,* which was a suit brought under the Labor-Management Reporting and Disclosure Act, the rights vindicated here as a result of Holodnak's action will be of great benefit to all employees at the Avco plant. Benefits such as those achieved here "would be lost in most instances without the discretionary authority in courts to grant counsel fees," since individual employees generally lack the resources to take on the company or the union. 462 F.2d at 780. The alleged wrong inflicted on the employee, the loss of employment in violation of contractual rights; the anticipated recovery, perhaps too insubstantial to sustain competent counsel's best efforts, and the ultimate purpose of making the employee whole, all suggest that the employee should retain his lost earnings for himself. Vaca v. Sipes, 386 U.S. at 210, 87 S.Ct. 903 (Mr. Justice Black dissenting); De Arroyo v. Sindicato de Trabajadores Packinghouse, *supra.*

While violation of Holodnak's rights was caused primarily by Avco's actions, it cannot be said that the union's breach of its duty of fair representation did not contribute to Holodnak's need for counsel to assert his rights. On all the circumstances of the case, a fair apportionment of the liability for counsel fees and expenses is that Avco pay two-thirds and the union one-third.

The amount of counsel fees which should be awarded is a matter which the court is unable at present to determine. Counsel for plaintiff is directed to offer detailed proof of the extent of time de-

voted in preparation and trial of this case and the expenses incurred by all attorneys for whose services compensation is sought, within fifteen days of the filing of this opinion. Avco and the union may file objections thereto ten days after receipt of a copy thereof.

Accordingly, it is ordered that Avco compensate the plaintiff $9,113.24 in back pay plus $10,000 in punitive damages with interest at 6% from the date of judgment. Additionally, Avco and the union are to pay the plaintiff's attorney fees in an amount to be determined.

The foregoing constitutes the court's findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

## APPENDIX

## BUILDING A UNION LOCAL

### WHY THE UAW LOCAL AT AVCO IS FLOUNDERING

by Mike Holodnak

*The author works at Avco-Lycoming in Stratford.*

The entire Local union in Avco is of course composed of people who are a product of the established society, that is, conditioned to respect a set of values that hold us in the control of special interests. So already, even before we begin, we have one strike against us. Yet, miraculously, the bulk of the rank and file, in its hunger for freedom, continues to retain enough of its intrinsic independence to be unruly, disrespectful and almost radical in its attitude toward this controlling authority. This is a positive attitude toward building a strong union. But the Local leadership, on the other hand, has somewhere along the line capitulated, fallen down on the job to become tricked by the company into policies that are apologetic, compromising and retreating, a negative attitude that continues to keep our union weak.

For example: The current course of moderation, charted by the Shop Committee, is alienating and frustrating the membership to no end. "We have to go easy on the company or it will move out," our union officials warn. And so, despite the fact that the company has a stupid, incompetent and irresponsible management that has arrogantly sabotaged the grievance procedure, the union members must continue to kiss the company's posterior for the privilege of living. But labor history clearly shows that being obedient and submissive will not alter the company's behavior one way or another. The company right now is answerable to no one, and when it decides to move out of an area it will do so regardless of how it affects people. In fact it will do so easier if we submit to it. But an aggressive union, one that stands up to the company and demands same equity in these decisions that affect us, will not only unite the membership, but can stop a move like that, as has been done in the 1930's by sitdown strikes that successfully stopped General Motors from its intended move out of an area. Of course the strategy in our case may not be identical, but a positive stand, on issues that concern our destiny, must be taken.

But unfortunately nearly the entire incumbent leadership is operating in a vacuum, devoid of empathy, totally isolated from the rank and file. To the more militant stewards the leadership says, "Sure the problem is hard on the members, but don't press the issue or Congress will make more laws against us, especially now that there is so much anti-union feeling in the country." Precisely the attitude that forster anti-union feeling. Or, "Compromise on grievances is necessary. We don't want to put the people's jobs in jeopardy." But now practically everyone's job is in jeopardy. Or, "Sure morally you're right, but . . ." That's right. We mustn't forget, the company's sacred laws forbid morality. Or, "We've got to be responsible." Question is, to whom? And a growing resentment in the rank and file blossoms out the word "Sellout" with increased regularity.

Naturally, the incumbent officers who are honest, hardworking and sincere for

the most part, retaliate against this resentment by growing increasingly more cynical of the people they are supposed to represent. They accuse the people of being selfish and fickle. And, in their claim that people do not make sense, they often point to a few individuals who are so completely irrational that they're nowhere. This of course is true in the case of some individuals, but it certainly does not reflect people as a whole. People taken together do make sense. It matters not whether injustice is foisted on them legally or illegally, they instinctively rebel against it. Now, despite last May's endorsement of the incumbent administration for a second term, members are again growing dissatisfied. It took them a while to become dissatisfied because they were bending over backwards to give it a chance and because it took a while for it to become unmistakable and obvious that the Local was again floundering. Now the people are generally abusive and insulting to their officials, and there's no question that they will dismiss them in the next election, as has been done through most of this Local's history.

The Sunday monthly union meetings, even before the company began working the employees on Sunday overtime, have long been regarded by the members as a futile way of achieving effective policies in the plant. All the members keep doing is changing officers in the hope of some day stumbling upon some that will truly represent them. But so far, this has solved nothing.

Would it not be more practical for all of us to get to the core of the problem? Like what causes the rank and file to be so different from the leadership when they are both cut from the same cloth?

The process is, of course, complicated and subtle, but in simple form doesn't it go something like this?

Most union members resent being treated like kindergarten children by the company and, when an opportunity presents itself, do not hesitate to act individually or in a group against the company. And in a union confrontation with the company, such as an official strike, the unity and militancy is overwhelming. But only a tiny few seek leadership roles. And those that do may not always be moved by the purest of motives, although, for the most part, their intentions are good. Anyway, Avco, like all large corporations, has become sophisticated in its underhanded union busting tactics, which run the gamut from sweet talk, giving special privileges to company orientated candidates (such as allowing them to campaign on company time), using rats (stool pigeons), to making it miserable for and sometimes firing the really dedicated unionists, and last but not least, buying off whatever other effective opposition may be left with a foremanship. And so the few really good ones who may survive all that become an ineffective minority for getting really effective policy established. And, even if, after all the company's tricks, a majority of militant people is elected, the company brings its brain-washing technique into play to sway enough of them to throw the balance of power in the company's favor.

In other words, the main difference between the leadership and the rank and file is that the leadership has been directly exposed to the company's corrupting influence while the rank and file has not. It is a difference that is artificially induced by the company.

Yet, although the company concentrates most of its brain-washing efforts on the union leadership, it does not completely ignore the membership. It constantly bombards the membership with divide-and-conquer tactics, probing for weak spots, sowing distrust and playing one employee against another, fragmenting and scattering its militancy into a poison that hurts only the union. There is no doubt that the membership is as directionless and wrong in its approach as the leadership, but nobody can deny the fact that it is more militant toward the company than the leadership.

Instead of suppressing this militancy, as the leadership is presently trying to do, it should be channeling it into a positive direction. In short, the leadership should be exposing the company's maneuvering for what it is so that some day

we will stop repeating the tragic mistakes of most of our past administrations.

It's probably true that wildcat strikes are not the answer, but wildcats wouldn't even be tempting if we had a good solid union that knows where it's at and that does not, through the grievance procedure, compromise away our rights. Yet it is comforting to have wildcats in our arsenal of weapons, just in case.

In any event, the company gets away with its devious and unfair labor practices because the company is above the law, (even the more naive realize this) and the biased judges and arbitrators, for all practical purposes, belong to the company. The most recent example was the firing of the twenty-two so-called "hard core of miscreants." From his Heavenly perch the "impartial" Arbitrator, backing up the company, pronounced his God-like opinion upon us poor sinful mortals while praising the pure-as-the-snow "patient company" to the high heavens.

Nevertheless, many of our union officials keep telling us to be "reasonable." But this is precisely what most of us have been for too many years, and it's been ridiculous. Imagine what further disasters would have befallen our country if the American people had consented to President Johnson's pleas of "Let us reason together." Even with a "heavy heart" it would have been preposterous.

Was George Washington reasonable when he challenged the established order of British domination? Was Galileo reasonable when he challenged the church's concept of the universe? Was Columbus reasonable when everyone, in his day, knew that the world was flat? And wasn't Jesus Christ even more unreasonable? The most reasonable thing for him would have been to say, "I don't want to get involved." It certainly would have

saved him the hard time the establishment gave him on the cross. Still, he handed us some pretty good ground rules for moral behavior.

The point is that nothing has ever been accomplished by so-called "reasonable people." Actually it's unreasonable to tell us that we must be "reasonable" to all the official insanity that exists around us. The labor movement itself would have never been born if the workers had been "reasonable."

Still, though the labor movement has raised the status of workers from animals to sub-humans, the relations between the company and employees has not changed since then; the same peculiar setup still exists. Uncompromising struggle is what must continue—without letup—till every person in this country has the opportunity to become a full human being.

Only company unions, that is those which are set-up and controlled by the companies, can have harmonious relations. And any union official who believes that the union must get along with the company is simply deceiving and selling the union members down the river.

We must reject the past policies and directionless campaigns for union office which were comprised of one group slandering another, with each campaign giving the members, especially the new ones, the worst possible impression of unionism, while the company, snickering behind the scenes, came out of it all smelling like a rose.

Only when we see it like it is will we be able to do something about our many problems. Only when we demand slates of candidates in general elections who have a policy and who run on a platform based on union principles will we begin to unite and move our union forward.

It's all up to us.