William JENSEN, Edwin Kremer, John Gardella, William Kuyl, Dominick Bisbano, Lindsay Hoyt, Francis S. Haggerty, Richard Trippe, Anthony Lore, and Gary W. Lueck, Plaintiffs,

v.

FARRELL LINES, INC., International Organization of Masters, Mates and Pilots, AFL–CIO, Brotherhood of Marine Officers, District 1, MEBA, AFL–CIO, and American Federation of Labor and Congress of Industrial Organizations, Defendants.

No. 79 Civ. 1372 (RWS).

United States District Court,
S. D. New York.

July 13, 1979.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for Farrell Lines, by Alexander Gigante, New York City, of counsel.

Burton M. Epstein, Waldman & Waldman, New York City, for MMP, by Seymour M. Waldman, New York City.

Gordon & Schechtman, P. C., New York City, for Jensen, et al., by Murray A. Gordon, Helene M. Freeman, New York City, of counsel.

SWEET, District Judge.

This action has presented an intricate tapestry of issues concerning contractual rights, legislative construction, and constitutional interpretation, all in the framework of labor law, itself elaborate and highly specialized. The defendants urge that these issues are beyond the reach of this court, principally because plaintiffs, who are supervisors, are outside the protections of the relevant statutory law and of the constitution. According to defendants, plaintiffs have extinguished their only rights, those grounded in contract, because those rights have been abrogated by arbitration. One strand in this tapestry, emphasized by plaintiffs, is that there is a constitutional right to associate which includes a right to be represented by a majority-selected union. While a district court might prefer to avoid these difficult issues, they have been squarely presented by highly skilled counsel for the parties. Because of this court's belief that "ordered liberty", (remarks, Chief Justice Burger, Law Day, May 1, 1979), *A.B.A. Journal*, June 1979, at p. 932, is an essential ingredient of our complex society, the court is unwilling to declare that plaintiffs are without recourse to relief in their effort to assert organizational rights in a labor dispute. The court will therefore grant declaratory relief for the plaintiffs as set forth more fully below.

*The Parties*

Plaintiffs are ten licensed deck officers and engineers who are supervisory employees in the maritime shipping industry, members of defendant Brotherhood of Marine Officers, District 1, National Marine Engineers Beneficial Association, AFL–CIO

("BMO").[1] They have all been employed for a substantial period of time aboard certain vessels formerly owned and operated by American Export Lines, Inc. ("AEL") and since on or about January, 1978, owned and operated by defendant Farrell Lines, Inc. ("Farrell"). "Farrell" is a New York corporation which owns and/or operates merchant cargo and bulk carriage vessels as a U.S.-flag ocean carrier; the defendant "BMO", is an affiliate of the National Marine Engineers' Beneficial Association, ("MEBA"); the defendant International Organization of Masters, Mates and Pilots, AFL–CIO ("MMP"), is an affiliate of the International Longshoreman's Association ("ILA"); and the defendant American Federation of Labor-Congress of Industrial Organizations ("AFL–CIO"), is the national umbrella association of which MMP and BMO are members, which was served with a copy of the amended complaint but did not appear at trial, no relief having been sought against it.

## The Claims and Prior Proceedings

Plaintiffs' claims, as broadly pleaded in their amended complaint, resolved after the course of trial down to three basic assertions.[2]

1. The individual plaintiffs are as follows:

Plaintiff WILLIAM JENSEN is a citizen of the United States and a resident of the State of New Jersey and has been employed aboard vessels owned and operated by AEL and Farrell since 1951. He was Captain of the "Export Courier" prior to the events culminating in this action.

Plaintiff EDWIN KREMER is a citizen of the United States and a resident of the State of Pennsylvania and has been employed aboard vessels operated by AEL and Farrell since 1960. He held a Master's license and was Chief Officer on the containership "Export Freedom" prior to the events culminating in this action.

Plaintiff JOHN GARDELLA is a citizen of the United States and a resident of the State of Pennsylvania and has been employed aboard vessels operated by AEL and Farrell since 1946. Prior to the events culminating in this action he was the Chief Engineer on the containership "Admiral Callaghan."

Plaintiff WILLIAM KUYL is a citizen of the United States and a resident of the State of New Jersey and has been employed aboard vessels operated by AEL and Farrell since 1963. He holds a Master's license and prior to the events culminating in this action was employed as Second Mate on the containership "Staghound."

Plaintiff ANTHONY LORE is a citizen of the United States and a resident of the State of New York and has been employed on vessels operated by AEL and Farrell since 1947. He was registered and scheduled for employment as a licensed Deck Officer on the containership "Staghound" as of March 15, 1979, but was subsequently denied such employment allegedly for reasons which gave rise to this action.

Plaintiff GARY W. LUECK is a citizen of the United States and a resident of the State of New York and has been employed on vessels operated by AEL and Farrell since 1973. He was registered and scheduled for employment as a licensed Deck Officer on the containership "Staghound" as of March 15, 1979 but was subsequently denied such employment alleged-

ly for the reasons which gave rise to this action.

Plaintiff DOMINICK BISBANO is a citizen of the United States and a resident of the State of Rhode Island and has been employed on vessels operated by AEL and Farrell since 1965. He holds a Chief Engineer's license and prior to the events culminating in this action was First Engineer on the containership "Export Patriot."

Plaintiff LINDSAY HOYT is a citizen of the United States and a resident of the State of New York and has been employed on vessels operated by AEL and Farrell since 1969. He was registered and scheduled for employment as a licensed Deck Officer on the containership "Staghound" as of March 15, 1979, but was denied such employment allegedly for reasons which gave rise to this action.

Plaintiff FRANCIS S. HAGGERTY, is a citizen of the United States and a resident of the State of Maryland and has been employed on vessels operated by AEL and Farrell since 1963. He was registered and scheduled for employment as a licensed Deck Officer on the containership "Staghound" as of March 15, 1979, but was denied such employment allegedly for reasons which gave rise to this action.

Plaintiff RICHARD TRIPPE is a citizen of the United States and a resident of the State of Connecticut and has been employed on vessels operated by AEL and Farrell since 1965. He was registered and scheduled for employment as a licensed Deck Officer on the containership "Staghound" as of March 15, 1979, but was denied such employment allegedly for reasons which gave rise to this action.

2. Plaintiffs also pleaded several other claims which were not significantly developed or contested at trial and which upon consideration by the court, have been determined to be of no consequence to the resolution of this dispute, primarily because they are subsumed under the claims which were vigorously contested by the parties. Those subsidiary claims include: a

First, the plaintiffs allege that Farrell and MMP, by enforcing an arbitration award handed down in a proceeding between the ILA and MEBA, committed unfair labor practices as defined in the National Labor Relations Act, 29 U.S.C. § 158. In their second claim, plaintiffs allege that BMO breached its statutory duty of fair representation under 29 U.S.C. § 185 to the plaintiffs by the BMO's conduct following Farrell's purchase of the AEL ships including, *inter alia*, its failure to raise a constitutional claim at arbitration and to sue to prevent enforcement of the award. In their third claim, the plaintiffs allege that Farrell's enforcement of the award is a violation of their First Amendment freedom of association in that it forces them to join a union not of their own choosing as a condition of their continued employment.

This action was originally brought on by a motion seeking a preliminary injunction pursuant to Rule 65, Fed.R.Civ.P. Plaintiffs at that time alleged, pursuant to Section 502 of the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1132, that certain contract and pension rights were being denied them as a

result of defendants' actions. This court, by Order dated March 16, 1979, issued an opinion denying that motion. After acquiring new counsel, plaintiffs filed an amended complaint and again moved pursuant to Rule 65, Fed.R.Civ.P., for a preliminary injunction. In making the new motion plaintiffs alleged irreparable injury arising out of the violation of their statutory and constitutional rights. The original ERISA claim was then withdrawn, and the exhibits previously introduced at the first hearing were deemed to be received in evidence at the new hearing.

After evidentiary hearings on the latter application for preliminary relief, the court, exercising its discretion pursuant to Rule 65(a)(2), Fed.R.Civ.P., ordered that the trial of the action on the merits be advanced and consolidated with the preliminary injunction hearing.[3]

*The Facts*

The plaintiffs' claims challenge a long standing industry practice dealing with the resolution by arbitration of inter-union jurisdictional disputes and arise out of the following facts.

---

claim arising out of the plaintiffs' forced removal from Farrell's ships alleging that Farrell and MMP conspired in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1985, to violate plaintiffs' freedom of association, other civil rights, and rights secured to them under the privileges and immunities clause of the Constitution, U.S.Const. Article IV, sec. 2; and a claim against each individual defendant on the same statutory ground arising out of the enforcement of the arbitration award alleging that the forced removal of the BMO men from Farrell's ships constituted a violation of their right to employment free from discrimination. *See generally Local No. 1 (ACA), Broadcast Employees of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 419 F.Supp. 263, 274–77 (E.D.Pa.1976) (discussion of civil rights statutes in the labor relations context).

Plaintiffs also filed a claim under the Fifth Amendment alleging deprivation of a property right without due process of law, U.S.Const. Amend. V; and a claim under the Jones Act, 46 U.S.C. §§ 591 *et seq.* for wages and wrongful discharge.

3. Defendant MMP objected to the Fed.R.Civ.P. 65 consolidation. Mindful that notice to the parties of consolidation is a prerequisite under Rule 65(a)(2), Fed.R.Civ.P., *see generally Acha v. Beame*, 531 F.2d 648, 651 (2d Cir. 1976), the Court's reference to consolidation was made at the outset of the hearings and all the parties conducted the litigation as a full-blown trial on the merits. There was ample opportunity for each to present all his evidence. *See generally Galella v. Onassis*, 487 F.2d 986, 997 (2d Cir. 1973); 7J Moore, *Federal Practice* ¶ 65.04[4]. Although MMP asserted that discovery would have provided an opportunity to develop more evidence relating to its contentions, no offered proof regarding specific areas of evidence which would have been relevant to the issues here discussed was made. This is especially so in light of the extensiveness of the evidence presented and the lack of surprise. *See Eli Lilly & Co. v. Generix Drug Sales, Inc.*, 460 F.2d 1096, 1105 (5th Cir. 1972) (cited with approval in *Galella v. Onassis, supra*, 487 F.2d at 998). *See also City of Rye v. Shuler*, 355 F.Supp. 17, 19–20 (S.D.N.Y.1973).

Until January, 1978, Jensen and the other nine plaintiffs were employed as licensed deck officers on vessels owned or operated by AEL, a subsidiary of American Export Industries, Inc., ("AEI"), a New York shipping corporation. Pursuant to a reorganization plan resulting from proceedings under Chapter XI of the Bankruptcy Act, 11 U.S.C. §§ 701 *et seq.*, AEL agreed to sell the 25 AEL owned or operated ships to Farrell. At all pertinent times prior to the sale, AEL and BMO had a valid collective bargaining agreement with a union shop provision under which the approximately 180 AEL supervisors working on AEL ships were members of, and exclusively represented by, the BMO. Farrell, the purchaser in bankruptcy, owned or operated fourteen of its own ships immediately prior to the sale. At all times pertinent to this suit, Farrell has been a party to a multi-employer collective bargaining agreement with the MMP. That agreement provides that all licensed deck officers employed by Farrell shall be members of the union.

Shortly after Farrell purchased the AEL ships and integrated them into its normal operations, Farrell signed an agreement acknowledging the contract between the BMO and AEL. Afterwards, Farrell and BMO representatives negotiated a wage increase for the employees covered under the old contract which, in its prefatory language, acknowledged the validity of the BMO contract and Farrell's assumed obligations respecting collective bargaining. Based upon its own contract with Farrell, however, the MMP, shortly after the sale in bankruptcy, asserted that it, not the BMO, was entitled to represent the men working on the newly acquired ships.

The MMP, by its parent, (ILA) submitted the dispute over representation rights to arbitration under Article XX of the AFL–CIO constitution.[4] In the arbitration proceedings the parent organizations of BMO and MMP (MEBA and ILA, respectively) introduced extensive briefs, all of which were introduced in evidence at trial. Arbitrator Daniel Q. Mills found that the Farrell

4. Quoted below are the most relevant sections of Article XX of the AFL–CIO constitution:

Sec. 2. Each affiliate shall respect the established collective bargaining relationship of every other affiliate. No affiliate shall organize or attempt to represent employees as to whom an established collective bargaining relationship exists with any other affiliate. For purposes of this Article, the term, "established collective bargaining relationship" means any situation in which an affiliate, or any local or other subordinate body thereof, has either (a) been recognized by the employer (including any governmental agency) as the collective bargaining representative for the employees involved for a period of one year or more, or (b) been certified by the National Labor Relations Board or other federal or state agency as the collective bargaining representative for the employees.

Sec. 10. The Impartial Umpire shall make a determination, after hearing, based upon the principles set forth in this Article. He shall make such determination within a time specified by the President unless an extension of time is agreed to by the parties. The President shall transmit copies of the determination to all affiliates involved. He shall, at the same time, request any affiliate which the Impartial Umpire has found to be in violation of this Article to inform him as to what steps it intends to take to comply with such determination. Any response received, or the fact that no response has been received within a time fixed by the President, shall be communicated to the other parties to the dispute.

Sec. 13. The subcommittee of the Executive Council may disallow the appeal, in which event the determination of the Umpire shall be final, and subject to no further appeal and shall go into full force and effect; or the subcommittee may refer the appeal to the Executive Council, in which event the determination of the Umpire shall be automatically stayed pending disposition of the appeal by the Executive Council. The determination of the Umpire shall be sustained unless it is set aside or altered by vote of a majority of all of the members of the Executive Council. The decision of the Executive Council where an appeal is granted shall be final, and shall be effective as of the date therein specified.

Sec. 20. The provisions of this Article with respect to the settlement and determination of disputes of the nature described in this Article shall constitute the sole and exclusive method for settlement and determination of such dispute and the provisions of this Article with respect to the enforcement of such settlements and determinations shall constitute the sole and exclusive method for such enforcement. No affiliate shall resort to court or other legal proceedings to settle or determine any disputes of the nature described in this Article or to enforce any settlement or determination reached hereunder.

purchase constituted an accretion[5] of the BMO/AEL fleet to the MMP/Farrell fleet and that, primarily because the MMP contract provided for accretions whereas the BMO contract did not, the MMP contract[6] was to be given effect.

Following two internal AFL–CIO appeals pursuant to Article XX,[7] the arbitration award was finalized by the AFL–CIO executive committee on February 28, 1979, approximately a year after the initial arbitration began.[8] Farrell discontinued its pen-

sion, health, and vacation pay contributions under the BMO contract and began to make its contributions to the MMP plan.[9] Farrell also informed its BMO supervisors that they would have to join MMP as a condition of continued employment with Farrell.

Thus, if the plaintiffs and other BMO members had accepted the terms of the arbitration award they would, in effect, have been bound to a union shop agreement between MMP and Farrell and to the terms of the MMP constitution.[10] They would

---

**5.** In reaching that decision, arbitrator Mills rejected the following contention asserted by BMO's parent, MEBA: Farrell's purchase should be considered a merger of the two fleets because a greater number of ships, and consequently a larger number of licensed deck officer positions, was being added to the smaller, existing Farrell fleet.

**6.** The pertinent coverage provisions in the MMP collective bargaining agreement provide the following:

The Company recognizes the Organization as the sole representative for collective bargaining of its Licensed Deck Officers (except where specifically otherwise provided, the term, "Licensed Deck Officers" whenever and wherever used in this Agreement, includes the Master) on U.S.-Flag oceangoing vessels.

The parties agree that it shall be the essence of the Agreement that its administration shall be confined exclusively to the parties.

The Company will not engage in activities or assist or encourage Licensed Deck Officers, or others who are not members of the Organization, in activities calculated to undermine the status of the Organization as the sole collective bargaining representative. The Company will not attempt to influence or persuade any member of the Organization to withdraw therefrom nor will the Company, in any way, attempt to interfere with the internal affairs of the Organization.

All Employees who are presently members in good standing of the Organization, or any future members, shall be required to remain members in good standing during the life of this Agreement in order to continue their present employment or to be eligible for future employment subject to all other provisions of this Agreement, provided that the Company shall not be required to take action until first notified by the Organization, that such Employee has lost his good standing. The term "good standing" for purposes of Section II means the Employee or prospective Employee shall be paid up in all dues, service fees and assessments. [Section II, 1]

This Agreement covers the Licensed Deck Officers employed on oceangoing U.S.-flag vessels, owned, operated or bareboat chartered (both at present or at any time during the life of this Agreement) by the Company or any of its subsidiaries or affiliates (whether so at present or at any time during the life of this Agreement) as an owner, agent, operator or bareboat charterer. [Section V, 1(a)] In the event a tanker Company acquires a vessel other than a tanker vessel, or a dry-cargo Company acquires a tank vessel, such vessel will be covered under an Agreement similar to that between the Organization and Companies with similar type vessels. [Section V, 1(e)]

**7.** *See* footnote 4, *supra.*

**8.** The determination of the Impartial Umpire is dated July 31, 1978, and was received in evidence here.

**9.** Under the MMP group contract, fleet owner employers are required to make vacation salary payments to a union-run plan. Upon coming ashore, individual employees receive their accrued vacation pay from the plan, provided they are members in good standing and all their dues are paid. The vacation pay application form authorizes MMP plan trustees to deduct dues payments that are in arrears before sending out vacation pay. Under the BMO contract, licensed deck officers are entitled to receive their accrued vacation pay directly from the employers. Although the MMP system is not a technically-exact dues "check off", *see* Section 302 of the Taft-Hartley Act, 29 U.S.C. § 186, it effectively operates as one.

**10.** Sections 2(a) and 2(b) of the MMP Constitution provide:

Every member by virtue of his membership in the Organization is obligated to adhere to and follow the terms of the International Constitution and any applicable By-Laws, Work Rules or any directives promulgated thereunder and shall enjoy the rights, duties, privileges and immunities conferred by them

thereby have been bound to accept the MMP as their exclusive representative.

MMP offered the BMO members, including plaintiffs, membership in the union[11] on

and by statute. Each member shall faithfully carry out such duties and obligations and shall not interfere with the rights of fellow members.

Every member by virtue of his membership in the Organization authorizes it to act as his exclusive bargaining representative with full and exclusive power to execute Agreements with his employer governing terms and conditions of employment and to act for him and have final authority in presenting, processing and adjusting any grievance, difficulty or dispute arising under any Collective Bargaining Agreement or out of his employment with such employer, in such manner as the Organization or its Officers deem to be in the best interest of the Organization and the membership as a whole.

Section 5(f) of the Constitution of the MMP provides:

No member of the Organization may be a member of another maritime trade union or work under a Collective Bargaining Agreement of another maritime trade union without the express written permission of the International Subcommittee. If written permission is granted under this subsection, it shall only be valid for a period of six (6) months at which time the member must re-apply. If a member violates this provision, he shall be immediately suspended and shall not be entitled to any of the benefits and privileges of the Organization or its Collective Bargaining Agreements.

Section II, ¶ 1 of the MMP contract provides:

"The Company recognizes the Organization as the sole representative for collective bargaining of its Licensed Deck Officers (except where specifically otherwise provided, the term, "Licensed Deck Officers" whenever and wherever used in this Agreement, includes the Master) on U.S.-Flag oceangoing vessels.

The parties agree that it shall be the essence of the Agreement that its administration shall be confined exclusively to the parties.

The Company will not engage in activities or assist or encourage Licensed Deck Officers, or others who are not members of the Organization, in activities calculated to undermine the status of the Organization as the sole collective bargaining representative. The Company will not attempt to influence or persuade any member of the Organization to withdraw therefrom nor will the Company, in any way, attempt to interfere with the internal affairs of the Organization.

All Employees who are presently members in good standing of the Organization, or any future members, shall be required to remain members in good standing during the life of this Agreement in order to continue their present employment or to be eligible for fu-

ture employment subject to all other provisions of this Agreement, provided that the Company shall not be required to take action until first notified by the Organization, that such Employee has lost his good standing. The term "good standing" for purposes of Section II means the Employee or prospective Employee shall be paid up in all dues, service fees and assessments."

Section V, ¶¶ 1(a)(b)(e) provide:

This Agreement covers the Licensed Deck Officers employed on oceangoing U.S. flag vessels, owned, operated or bareboat chartered (both at present or at any time during the life of this Agreement) by the Company or any of its subsidiaries or affiliates (whether so at present or at any time during the life of this Agreement) as an owner, agent, operator or bareboat charterer.

The term "subsidiary" or "affiliate" shall be deemed to include any business entity whether corporate, partnership, trust, individual or otherwise, which is effectively controlled by or effectively controls the Company either directly or indirectly.

In the event a tanker Company acquires a vessel other than a tanker vessel, or a dry-cargo Company acquires a tank vessel, such vessel will be covered under an Agreement similar to that between the Organization and Companies with similar type vessels.

11. By the MMP offer, which was addressed to licensed deck officers on former AEL ships, and dated March 19, 1979, the BMO members were told:

In addition to those officers already holding Class "A" Group status by virtue of their MMP membership who are also BMO members, all former American Export Line Deck Officers accepted into membership will be afforded equal Class "A" Group status by virtue of their MMP membership who are also BMO members, all former American Export Line Deck Officers accepted into membership will be afforded equal Class "A" job rights on board the former AEL vessels. Such Officers being accepted into MM&P membership will also receive a free MM&P book giving them Class "C" shipping rights on all other MM&P contract vessels.

With the addition of the former AEL ships, the MM&P Offshore contract fleet numbers almost 400 ocean-going vessels. You will have the right to ship out on these ships from any one of the 20 Port offices located throughout the continental United States, Puerto Rico, and Hawaii, in accordance with our contract and Shipping Rules.

You have been working under the MM&P Offshore contract since March 5th and Far-

terms, *inter alia*, granting them the highest available seniority status of three grades accorded employees under the MMP contract for jobs on former AEL ships.[12] Certain of the BMO members, obviously excluding the plaintiffs, accepted the MMP offer. However, because communication with the 21 ships was by cable, and because the ultimatum pursuant to the arbitration award (concerning joining the MMP) could be implemented only as the former AEL ships reached port, it was unclear at the time of trial exactly how many members of the BMO intended to join the MMP.[13]

On March 12, plaintiffs received notice of the Farrell order when their ship, the CV *Staghound*, docked in Baltimore. On March 15, when their ship reached the port of New York, plaintiffs were informed of the effect of the arbitration award and of the requirement that they join the MMP as a prerequi-site to continued employment with Farrell. Upon refusing to sign MMP membership cards, plaintiffs were forcibly removed from the Farrell ships by the New York City police. This action was filed shortly thereafter.

### The First Claim

█ Plaintiffs have articulated two versions of their first (unfair labor practice) claim. In the first version, plaintiffs assert that defendants committed an unfair labor practice under the literal terms of 29 U.S.C. § 158. The obvious and fatal flaw of this first version is that plaintiffs are "supervisors"[14] under the definitional sections of the National Labor Relations Act (as amended) (NLRA) and, as supervisors, they are not statutory "employees" who are entitled to protection against statutory unfair labor practices.[15] Plaintiffs have also in-

---

rell Lines has been making contributions on your behalf to the MM&P's non-contributory Pension Plan, the MM&P Health and Benefit Plan, the MM&P Vacation Plan, the MM&P M.A.T.E.S. Program and the various other plans and committees required by the contract since that date. On signing foreign articles for a voyage of 30 days or over, you and your dependents will be fully covered by our Health and Benefit Plan which is widely acknowledged to have one of the most extensive hospital, surgical and medical programs available anywhere in the world. Under the contract, the plaintiffs could keep their membership in BMO renewable for six months (see footnote 10, *supra*.) if they received written permission. Otherwise they would have to resign or lose their jobs.

12. Extensive evidence was introduced at trial on the issue of differences between the two contracts with respect to wages, benefits and working conditions, including which provides greater security to chief officers, second mates and third mates. But contract damages are not of consequence to the injunctive relief issue here.

13. Farrell represented in open court that it did not care which union it bargained with, so long as there was only one representative to be dealt with.

14. No party has contested the conclusion that licensed deck officers are supervisory personnel under the relevant sections of the Act. *See, e. g.* plaintiffs' undated memorandum of law at 10, footnote, citing *Globe Seaways, Inc. v. National Marine Eng. Ben. Ass'n*, 451 F.2d 1159, 1160 n.1 (2d Cir. 1973). For a fuller discussion of the relevant sections of the Act in this regard, see the text of this opinion, *infra*, and see footnote 15 hereof.

15. The Labor Management Relations (Taft-Hartley) Act § 101, 29 U.S.C. § 152(3) (1970), amended the Wagner Act's definition of protected employees to *exclude* "any individual employed as a supervisor." Section 101 of the Act, 29 U.S.C. § 152(11) (1970), further defined a "supervisor" as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

The full text of the definition of "employee" in 29 U.S.C. § 152(3) is as follows:

The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, *but shall not include* any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or *any individual employed*

geniously urged this court to add to the body of federal common law in the labor area by urging that the identical conduct which would support a finding (by the NLRB) of an unfair labor practice under 29 U.S.C. § 158 (if non-supervisory personnel were involved) constitutes by implication a breach of contract which, plaintiffs assert, should be found to be actionable in a district court pursuant to 29 U.S.C. § 185. In effect, then, plaintiffs seek to surmount the Congressionally mandated bar to a 29 U.S.C. § 158 unfair labor practice claim face by non-employees such as supervisory personnel by reading into it a contract claim based on 29 U.S.C. § 185. The federal common law in this area commands no such result, and the plaintiffs' status as supervisory personnel deprives them of the right to assert an unfair labor practice claim in this court.

*Jurisdiction and Standing*

 Subject matter jurisdiction over the plaintiffs' second claim is properly in this court under 29 U.S.C. § 185 [16] even though supervisory personnel were excluded from the statutory definition of employees in the 1947 Taft-Hartley Act amendments to Section 2(3) of the Wagner Act, 29 U.S.C. § 152(3).[17] This conclusion derives primarily from the court's reading of cases which have analyzed the policies underlying the Act's supervisory exclusion, and which lead the court to conclude that a claim based on 29 U.S.C. § 185 is cognizable when plaintiffs are supervisory personnel. *See generally District 2 Marine Engineers Beneficial Association v. Amoco Oil Co.*, 554 F.2d 774 (6th Cir. 1977); *Globe Seaways, Inc. v. National Marine Engineers' Beneficial Association*, 451 F.2d 1159, 1160 n.1 (2d Cir. 1971); *United States v. National Marine Engineers' Beneficial Association*, 294 F.2d 385, 392 (2d

as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined.

(emphasis supplied). As indicated in footnote 14 of this opinion, the plaintiffs in this action are supervisory personnel. For background discussion of the exclusion of supervisory personnel from the definition of "employees" under the NLRA, see *N.L.R.B. v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134, *et. seq.* (1973); *N.L.R.B. v. Yeshiva University*, 582 F.2d 686, 695 (2d Cir. 1978), *cert. granted*, 440 U.S. 906, 99 S.Ct. 1212, 59 L.Ed.2d 453 (1979); *International Ladies' Garment Workers Union v. N.L.R.B.*, 339 F.2d 116, 121, *et seq.* (2d Cir. 1964). *See also* Note, 13 Ga.L.Rev. 313 (Fall 1978), R. Gorman, *Basic Text on Labor Law, Unionization and Collective Bargaining* (1976) at 33, *et seq. See also* footnote 18 of this opinion.

If the plaintiffs were not supervisory employees, the actions by Farrell could have been found to amount to an unfair labor practice. *See Garment Workers v. Labor Board*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961), wherein the Court remarked:

In their selection of a bargaining representative, § 9(a) of the Wagner Act guarantees employees freedom of choice and majority rule. *J. I. Case Co. v. Labor Board*, 321 U.S. 332, 339 [64 S.Ct. 576, 88 L.Ed. 762.] In short, as we said in *Brooks v. Labor Board*, 348 U.S. 96, 103, [75 S.Ct. 176, 99 L.Ed. 125,] the Act placed "a nonconsenting minority

under the bargaining responsibility of an agency selected by a majority of the workers." Here, however, the reverse has been shown to be the case. Bernhard-Altmann granted exclusive bargaining status to an agency selected by a minority of its employees, thereby impressing that agent upon the nonconsenting majority. There could be no clearer abridgment of § 7 of the Act, assuring employees the right "to bargain collectively through representatives of their own choosing" or "to refrain from" such activity. It follows, without need of further demonstration, that the employer activity found present here violated § 8(a)(1) of the Act which prohibits employer interference with, and restraint of, employee exercise of § 7 rights. *Id.* at 737, 81 S.Ct. at 1607 (footnote omitted). Under statutory provisions of the labor laws authorizing exclusive bargaining status, the plaintiffs, if covered, would have an opportunity to petition for decertification.

**16.** Section 185 of Title 29 of the United States Code, providing for suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce, is both jurisdictional and substantive in its effect. *See Textile Workers v. Lincoln Mills*, 353 U.S. 448, 449–50, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957); *Leonardis v. Local 282, Pension Trust Fund*, 391 F.Supp. 554, 556 (S.D.N.Y.1975).

**17.** See footnotes 14 and 15.

Cir. 1961); *Isbrandtsen Co. v. District 2, Marine Engineers' Beneficial Association,* 256 F.Supp. 68, 76–77 (E.D.N.Y.1966), (Zavatt, C. J.); *Accord Dente v. International Organization of Masters, Mates and Pilots, Local 90,* 492 F.2d 10, 12 (9th Cir.) *cert. denied,* 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974).[18]

■ Furthermore, where subject matter jurisdiction is based on 29 U.S.C. § 185, as is the case with plaintiffs' second claim, the court's jurisdiction is also invoked under 28 U.S.C. § 1337. *See generally Avco Corp. v. Aero Lodge 735,* 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126, *rehearing denied,* 391 U.S. 929, 88 S.Ct. 1801, 20 L.Ed.2d 670 (1968): "Title 28 U.S.C. § 1337 says that 'The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . .' It is that original jurisdiction that a § 301 action invokes." *Id.,* 390 U.S. at 561–62, 88 S.Ct. at 1238 (citation omitted).[19]

■ Subject matter jurisdiction over the third claim exists under 28 U.S.C. § 1331.[20] *See Evans v. American Fed. of Television and Radio Artists,* 354 F.Supp. 823, 837 (S.D.N.Y.1973), *rev'd on other grounds, Buckley v. American Fed. of Television and Radio Artists,* 496 F.2d 305 (2d Cir. 1974), *rehearing denied* 420 U.S. 956, 95 S.Ct. 1342, 43 L.Ed.2d 433 (1975).[21] In *Evans,* as here, the analysis of subject matter jurisdiction under 28 U.S.C. § 1331 was based on the reasoning that plaintiffs' rights ultimately depended upon an interpretation of the Constitution. *See Id.* at 837 and cases cited therein.

Because the constitutional claim raises the question of whether enforcement of the arbitration award would be an impermissible infringement of plaintiffs' First Amendment rights and therefore void as against public policy, subject matter jurisdiction over this claim is proper and a cause of action is stated.[22]

**18.** This court has jurisdiction over the second claim even though supervisory unions may not be entitled to sue as labor organizations in other contexts. *See generally Hanna Mining Co. v. Dist. 2 Marine Engineers Beneficial Association,* 382 U.S. 181, 189–90, 86 S.Ct. 327, 15 L.Ed.2d 254 (1965). The debate over subject matter jurisdiction under 29 U.S.C. § 185 has focused on the meaning of the term "employee" for the purposes of its application with respect to labor organizations "representing employees." The Court of Appeals for the Second Circuit, in the cases cited in the text accompanying this footnote has adopted the position that the Taft-Hartley amendment to the National Labor Relations Act adopting the exclusion was meant only to apply to statutory "employees" under those sections of the Act dealing with unfair labor practices and other matters within the primary jurisdiction of the National Labor Relations Board. Following that view, this court finds that the plaintiffs, regardless of their supervisory status, are entitled to assert their second claim under 29 U.S.C. § 185 as members of labor organizations.

**19.** For an overview of the different theories upon which courts have based their conclusions that they have jurisdiction to enforce the duty of fair representation, *see* R. Gorman, *Basic Text on Labor Law Unionization and Collective Bargaining* (1976) at Chapter 30, § 3.

**20.** The requirements for finding jurisdiction under the cited statute are set forth in *PAAC v. Rizzo,* 502 F.2d 306, 312 (3d Cir. 1974), *cert. denied,* 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975). *See also Duke Power Co. v. Carolina Environ. Study,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *T. B. Harms Co. v. Eliscu,* 339 F.2d 823, 827 (2d Cir. 1964), *cert. denied,* 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965); *Rosenthal & Rosenthal, Inc. v. Aetna Casualty & Surety Co.,* 259 F.Supp. 624, 627 (S.D.N.Y.1966). With respect to the jurisdictional amount question, *see Committee for GI Rights v. Callaway,* 171 U.S.App.D.C. 73, 80 n.19, 518 F.2d 466, 473 n.19 (D.C.Cir.1975); *Hartigh v. Latin,* 158 U.S.App.D.C. 289, 293, 485 F.2d 1068, 1072 (D.C.Cir.1973), *cert. denied sub nom. Dist. of Columbia v. Marsh,* 415 U.S. 948, 94 S.Ct. 1470, 39 L.Ed.2d 564 (1974); S.Rep.No.1830, 85th Cong., 2d Sess. 3 (1958).

**21.** In *Buckley, supra,* the Court of Appeals for the Second Circuit "conclude[d], without having to decide the issue of whether AFTRA's dues requirement is 'government action', that the district court had jurisdiction to adjudicate the appellees' claims that AFTRA's dues requirement impinges upon appellees' first amendment rights." 496 F.2d at 310.

**22.** In *Holodnak v. Avco Corp.,* 381 F.Supp. 191 (D.Conn.1974), *modified,* 514 F.2d 285 (2d Cir.), *cert. denied,* 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975), the Honorable J. Edward

■ Plaintiffs have standing to challenge the arbitration award under their second claim. *See generally Santos v. Dist. Council of New York City,* 547 F.2d 197 (2d Cir. 1977) (suit brought by union members seeking enforcement of an Article XX arbitral award). In *Santos* the court rejected the contention that only unions, not individual union members, have standing to seek enforcement of an Article XX arbitration award. *Id.* at 200. Here, as in *Santos,* plaintiffs have not suffered "mere 'emotional disappointment'; they have lost their jobs . . . ." *Id.* at 200. That they are not signatories to the relevant contracts does not deprive them of standing to sue for contractual enforcement under 29 U.S.C. § 185. *Id.* at 200, n.3. Plaintiffs have sufficiently alleged that they have sustained injury from enforcement of the arbitration award and that they " 'personally would benefit in a tangible way from the courts' intervention'." *Santos* at 199, quoting from *Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ Plaintiffs have also sufficiently shown a definite injury and personal stake in the outcome of this litigation to maintain their constitutional claim, principally because the action arises out of events culminating in their loss of employment and forced removal from place of employment, allegedly for asserting the right they now seek to have vindicated.[23] In the instant case, the forced removal of plaintiffs from the ships on which they served and their loss of employment was occasioned by their assertion of a First Amendment right and constitutes, therefore, the requisite objective harm.[24] *Cf. McQueen v. Druker,* 438

Lumbard, sitting by designation, asserted that he did not decide whether the rationale of *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), extends to actions charging violations of the First Amendment, 381 F.Supp. at 204, n.12. On appeal, the Court of Appeals for the Second Circuit indicated its belief that, notwithstanding his disclaimers, Judge Lumbard did decide in the affirmative that *Bivens* applies to actions under the First Amendment, 514 F.2d 285, 292 (2d Cir. 1975). The Second Circuit itself, however, found it unnecessary to decide the question, and has still not expressed a view on the issue. Other Circuit Courts have, however, held that there is a private cause of action for damages directly under the Constitution for violation of First Amendment Rights. *See e. g., Dellums v. Powell,* 184 U.S.App.D.C. 275, 302, 566 F.2d 167, 194 (D.C.Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *Yiamouyiannis v. Chemical Abstracts Service,* 521 F.2d 1392, 1393 (6th Cir. 1975), *cert. denied* 439 U.S. 983, 99 S.Ct. 573, 58 L.Ed.2d 654 (1979); *Paton v. La Prade,* 524 F.2d 862, 869–70 (3d Cir. 1975); *Writers Guild of America, West, Inc. v. F.C.C.,* 423 F.Supp. 1064, 1088–89 (C.D.Calif.1976). Because of the declaratory nature of the relief awarded here, this court need not decide whether a private party may recover monetary damages for a violation of his First Amendment Rights.

**23.** In *Duke Power Co. v. Carolina Environ. Study, supra,* the Supreme Court summed up the requirements for a finding of constitutional standing. *See also St. Martins Press, Inc. v. Carey,* 605 F.2d 41, (2d Cir. 1979). As indicated in the text accompanying this footnote the court has found that these requirements have been met in the instant case.

**24.** Plaintiffs are in the position to challenge the constitutionality of maritime industry practice in this case because Farrell assumed the employer's obligations under the AEL–BMO contract following Farrell's purchase of the 21 AEL ships. Normally, under pre-hire contracts there would be a majority union representative because no deck officer would be hired until he at least became an applicant for membership in the union. The circumstances of this case are peculiar because Farrell entered into a contract with the BMO even though it could have released the BMO deck officers on the ground that bankruptcy terminated the AEL–BMO contract. Had Farrell done so, it would have been within its rights under *International Organization of Masters, Mates and Pilots, AFL–CIO v. National Labor Relations Board,* ("Cove Tankers Corporation"), 188 U.S.App.D.C. 15, 21, 575 F.2d 896, 902 (D.C.Cir.1978) and *International Organization of Masters, Mates and Pilots, AFL–CIO v. National Labor Relations Board,* ("Westchester Marine Shipping Co."), 539 F.2d 554 (5th Cir. 1976), *cert. denied* 434 U.S. 828, 98 S.Ct. 106, 54 L.Ed.2d 86 (1977) which impliedly upheld the practice and effect of replacing members of one union with members of another union upon the transfer of ownership of the ships. *See generally National Labor Relations Board v. National Maritime Union of America, AFL–CIO,* 486 F.2d 907, 913–914 (2d Cir. 1973) *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974); *Moore McCormack Lines, Inc.,* 139 NLRB 796, 798–99 (1962). However, by recognizing BMO, ostensibly for the purpose of preserving labor

F.2d 781 (1st Cir. 1971) (loss of tenancy occasioned by assertion of First Amendment right). Furthermore, according to the contract, the MMP, even if it does not represent a majority, is in a position to bind the plaintiffs to any agreement it might make. This threat of future harm is sufficiently "specific" in the First Amendment context to rise above the level of a mere "specific chill". *See Carey, supra* note 23.

The defendants have asserted that plaintiffs do not have standing, arguing that the MMP benefits equal or exceed those of the BMO, and that because plaintiffs had the opportunity to join MMP, no injury resulted. Initially, of course, this fails to meet plaintiffs' principal contention, viz, their loss of the right to be represented by a majority-selected union. In addition, however, the proof at trial established significant differences between the operation of the two collective bargaining agreements as to vacation benefits, seniority, selection of billets, and overtime payments, among other benefits. The loss or modification of these rights constitutes an independent basis for standing.

*The Second Claim*

 As stated above, plaintiffs urge this court to vacate the Article XX arbitration award on two grounds over which this court has subject matter jurisdiction.[25] In their second claim plaintiffs allege that the BMO breached its duty of fair representation, primarily by not raising certain legal issues at the Article XX proceeding and by recognizing the collective bargaining agreement between MMP and Farrell Lines rather than enforcing BMO's own contract with Farrell. It is well settled that in reviewing an arbitrator's award, "the court's function in confirming or vacating an arbitration award is severely limited. If it were otherwise, the ostensible purpose for resort to arbitration, i. e., avoidance of litigation, would be frustrated." *Amicizia Societa Na-*

*vegazione v. Chilean Nitrate & Iodine Sales Corp.*, 274 F.2d 805, 808 (2d Cir.), *cert. denied*, 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727 (1960) (citation omitted). This is an outgrowth of the Supreme Court's endorsement, in the "Steelworker's Trilogy", of the notion that arbitration is the preferred method of settling disputes which arise from collective bargaining agreements. *See United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). In light of these decisions a court will vacate an arbitrator's award only where it has been shown that the award was tainted with impropriety. In no circumstances will a court substitute its judgment for that of the arbitrator merely because the court disagrees with the arbitrator concerning the merits of the action. *Timken v. Local 1123, United Steelworkers*, 482 F.2d 1012, 1014 (6 Cir. 1973). As stated in *Enterprise Wheel & Car Corp., supra* :

the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

363 U.S. at 599, 80 S.Ct. at 1362.

 It is equally well settled, however, that an arbitration award may be vacated on the ground that there was fraud, partiality or other misconduct on the part of the arbitrator, or that the award was based upon a manifest disregard of the law. *See, e. g., Botany Industries, Inc. v. Amalgamated Clothing Workers of America*, 375

---

peace, Farrell precipitated the Article XX proceeding which resulted in the arbitration award challenged in this action.

**25.** The conclusion that this court has subject matter jurisdiction over plaintiffs' second and third claims is unaffected by the procedural

posture of the action as a challenge to an Article XX arbitration award. *See Kallen v. District 1199, National Union of Hospital and Health Care Employees, RWDSU, AFL–CIO*, 574 F.2d 723, 725 (2d Cir. 1978).

F.Supp. 485, 490 n.6 (S.D.N.Y.1974), and cases cited therein. In addition, it is within the province of the court to overturn an award if the award is contrary to public policy, *Local 453, Int'l Union of Electrical, Radio & Machine Workers v. Otis Elevator Company*, 314 F.2d 25, 29 (2d Cir. 1963), or if a union has failed to provide the aggrieved employee(s) with fair representation in the course of the grievance or arbitration process. *Vaca v. Sipes*, 386 U.S. 171, 184–86, 87 S.Ct. 903, 17 L.Ed.2d 842; *Suissa v. American Export Lines, Inc.*, 507 F.2d 1343, 1347 (2d Cir. 1974). Only this last ground has been advanced here.

The phrase "duty of fair representation" is a term of art which is incapable of precise definition. *Griffen v. International U., U.A.W.*, 469 F.2d 181, 182 (4th Cir. 1972). Thus, in determining whether a union has breached its duty of fair representation, a court must examine the relevant facts of each case. *Simberlund v. Long Island Railroad Company*, 421 F.2d 1219, 1225 (2d Cir. 1970), and cases cited thereat.

The "duty of fair representation" doctrine was first articulated in *Steele v. Louisville & N. R. R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), a case involving the Railway Labor Act. In *Steele* the Supreme Court indicated that a union has a statutory duty to represent fairly all members of the employee bargaining unit. Soon thereafter, the Court extended this doctrine to cases arising under Section 301 of the NLRA, as amended, 29 U.S.C. § 185. *Ford Motor Company v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). In representing its employees, declared the court, a union is permitted "[a] wide range of reasonableness," but this latitude is "subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Id.* at 338, 73 S.Ct. at 686. The duty is premised on the theory that because the union is the exclusive bargaining represent-ative of the employees, it has a statutory duty to represent fairly all employees in its collective bargaining with the employer and in its enforcement and administration of the resulting contract. *Ford Motor Company, supra.*

In *Vaca v. Sipes, supra,* the Court said: "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." 386 U.S. at 190, 87 S.Ct. at 916. The Court went on to say that "[u]nder this doctrine, the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca*, 386 U.S. at 177, 87 S.Ct. at 910, *citing Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964).

More recently, in *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473, *rehearing denied*, 404 U.S. 874, 92 S.Ct. 24, 30 L.Ed.2d 120 (1971), the Court said: "[f]or such a claim [breach of duty of fair representation] to be made out, . . . [plaintiff] must have proved 'arbitrary or bad-faith conduct on the part of the Union,' *Vaca v. Sipes, supra,* [386 U.S.] at 193 [87 S.Ct. 903]. There must be substantial evidence of fraud, deceitful action or dishonest conduct." *Id.* at 299, 91 S.Ct. at 1924, *citing Humphrey v. Moore, supra. See also Ryan v. New York Newspaper Printing, Inc.*, 590 F.2d 451, 455 (2d Cir. 1979). Based upon the authorities just referred to, this court has concluded that plaintiffs have not shown that BMO acted arbitrarily or in bad faith, and therefore, that, plaintiffs have not shown a failure on the part of BMO to represent them fairly at the arbitration proceeding.[26] BMO's force-

---

**26.** It is unclear whether fraud, deceitful action, or dishonest conduct on a part of defendant union is necessary to make out a claim of breach of the duty of fair representation. *See*

*Ryan v. New York Newspaper Printing, Inc.*, 590 F.2d 451, 455 and 456 (2d Cir. 1979), in conjunction with *Jones v. Trans World Airlines, Inc.*, 495 F.2d 790, 798 (2d Cir. 1974).

ful and persistent representation of its constituents in the Article XX proceeding and its conduct in the appeals from that proceeding can in no way be termed arbitrary conduct. At most, the BMO's failure to raise certain arguments might be said to amount to negligence, but proof that a union acted negligently or exercised poor judgment is not enough to make out a claim of unfair representation. *Franklin v. Southern Pacific Transp. Co.,* 593 F.2d 899, 901 (9th Cir. 1979); *Cannon v. Consolidated Freightways Corp.,* 524 F.2d 290, 293 (7th Cir. 1975); *Bazarte v. United Transportation Union,* 429 F.2d 868, 872 (3d Cir. 1970).[27] Furthermore, this court finds that BMO's recognition and acceptance of the contract between MMP and Farrell did not amount to a breach of the duty of fair representation. That BMO adopted an agreement which particular employees did not favor does not amount to hostile or discriminatory conduct and therefore does not constitute a breach of the duty of fair representation. The complete satisfaction of all who are represented by a union is hardly to be expected. *See Simburland v. Long Island Railroad, supra,* at 1227; *Ford Motor Company v. Huffman,* 345 U.S. at 338, 73 S.Ct. 681. As stated in *Humphrey v. Moore,* ". . . we are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another." 375 U.S. at 349, 84 S.Ct. at 371.

*The Third Claim*

In their third claim plaintiffs seek injunctive relief against Farrell's enforcement of the Article XX arbitration award on the ground that giving effect to the collective bargaining agreement between Farrell and MMP, including its exclusive representation provisions, would do violence to their First Amendment freedom of association. The argument thus presented challenges the maritime industry's practice of engaging in pre-hire collective bargaining contracts. Under this practice, a shipowner and a union enter into an exclusive representation agreement covering supervisory employees before any ships are actually built or any men are hired.[28] Before it can reach the merits of this third claim, however, the court must first determine that governmental action is involved. *See U.S. Const. Amend. I; Public Utilities Commission v. Pollack,* 343 U.S. 451, 461–62, 72 S.Ct. 813, 96 L.Ed. 1068 (1952); *Powe v. Miles,* 407 F.2d 73 (2d Cir. 1968).

*State Action*

Whether the government has or has not acted in a given circumstance is not an easy determination.[29] At least two primary strands of the government action doctrine can, however, be identified: the 'inter-

This court need not resolve that issue here because even absent fraud, deceitful conduct action or dishonest conduct, BMO did not act arbitrarily or otherwise in bad faith.

27. The court expresses no opinion concerning whether the conduct of BMO may have amounted to negligence because, as indicated in the text accompanying this note, negligent conduct alone would not suffice to support a claim of breach of the duty of fair representation.

28. Parallel Congressional authorization for union security agreements, such as pre-hire agreements, covering rank and file "employees" as defined by the National Labor Relations Act is found in 29 U.S.C. § 158(a)(3). Also, 29 U.S.C. § 159(a), the exclusive representation section of the NLRA, provides for union security in collective bargaining. In pertinent part 29 U.S.C. § 159(a) provides:

"*Representatives designated or selected for the purposes of collective bargaining by the majority of the employees* in a unit appropriate for such purposes, shall be the *exclusive* representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." (emphasis supplied)

The provision authorizing pre-hire contracts in the construction industry is 29 U.S.C. § 158(f).

29. *See generally* McCoy, Current State Action Theories, the *Jackson* Nexus Requirement, and Employee Discharges by Semi-Public and State-Aided Institutions, 31 *Vand.L.Rev.* 785, 788 n.19 (May 1978).

dependence' or 'symbiotic relationship, view articulated in *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722 and 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), under which a court carefully "sift[s] facts and weigh[s] circumstances" and, the 'sufficiently close nexus with the challenged action' view articulated in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). In *Jackson,* the Supreme Court set forth a view of state action not wholly consistent with the Court's earlier discussion in *Burton.* While apparently restricting *Burton's* scope, the *Jackson* Court did not, however, overrule *Burton.* Indeed, the *Jackson* Court's language indicates that at least something, of uncertain dimension survives of the "symbiotic relationship [test] presented in *Burton* . . . ." *Jackson,* 419 U.S. at 357–58, 95 S.Ct. at 457. Thus, the *Burton* analysis of state action, as refined in *Jackson,* is still in force.

Under the *Jackson* analysis, a finding that Farrell's actions constitute governmental action would turn on whether there is a "sufficiently close nexus between the [government] and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the [government] itself." *Jackson, supra,* at 351, 95 S.Ct. at 453 (citation omitted). *See also Graseck v. Mauceri,* 582 F.2d 203, 209 (2d Cir. 1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 91 (1979). In *Jackson* the Court held that the authorization and approval by the government of a private utility company's procedures did not transform the company's acts into governmental action. The Court indicated the government must "put its . . . weight" behind the challenged action to meet the test. 419 U.S. at 357, 95 S.Ct. 449. Prior to the *Jackson* decision, the Supreme Court had held that when governmental and private entities were so intertwined and their activities so interdependent that it could fairly

be said that they were symbiotic, there was state action. *Burton, supra.*

In *Jackson v. Statler Foundation,* 496 F.2d 623 (2d Cir. 1974), the Court of Appeals for the Second Circuit enunciated five factors which are particularly important to a determination of whether private conduct will be considered governmental action:

(1) the degree to which the "private" organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes government approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves a public function or acts as a surrogate for the State; (5) whether the organization has legitimate claims to recognition as a "private" organization in associational or other constitutional terms.

Each of these factors is material; no one factor is conclusive.

*Id.* at 629.

■■■■ These authorities, taken together, compel the court to conclude that the requisite state action exists, whether viewed in terms of "interdependence", "symbiosis", or "nexus". The competing rights at issue are those among union members *inter sese,* and among union members and their employers—all in an industry where the government subsidy to the employer is based upon, or perhaps more accurately stated results from the differential between the wages paid the union members and the wages paid to employees performing similar functions in foreign fleets. Exhibits which were received in evidence at trial indicate that Farrell received a cumulative sum exceeding $56 million in subsidies for operating costs, principally the cost of collective bargaining contracts.[30] Other exhibits indicate that at the time of

---

**30.** The Farrell Operating Differential Subsidy ("ODS") Voucher for payment of subsidy in 1978 reveals that under Farrell's ODS contract with the United States, Farrell received $24,-421,122.09, the vast majority representing government payments for wages and crew fringe benefits. The American Export Line

ODS Voucher for 1978, shows that, pursuant to the AEL operating differential subsidy contract with the United States, close to $32.5 millions were received in calendar year 1978. The cumulative total is thus in excess of $56 million.

trial Farrell was receiving approximately $3.75 million to defray the expense of operating the Farrell fleet. The United States government also provides construction differential subsidies for the construction of ships operated by Farrell,[31] and guarantees the payment of bonds and notes issued to provide financing for construction of such ships.[32] The routes for which subsidies are received must be approved by the government;[33] the United States also regulates extensively the manning and wage scales of officers and seamen serving aboard Farrell ships.[34] Indeed, the Merchant Marine Act of 1970 requires the existence of bona fide collective bargaining contracts before a fleetowner is eligible for the so-called Operating Differential Subsidy (ODS) and provides for Maritime Administration (MARAD) review of the fleetowners' collective bargaining costs. 46 U.S.C. §§ 1173(b), 1183.[35] Furthermore, the legislative history of the Merchant Marine Act of 1970, the statute which permits the subsidies received by Farrell, establishes that a primary purpose of the subsidies is to ensure a national maritime industry as an element in our national security.[36] *See* 1970 *U.S.Code Cong. & Admin.News,* p. 4188.

In this court's view, the perceived need for this subsidization stems largely from our nation's high standard of living and enlightened industrial democracy. These

**31.** Every ship operated by Farrell Lines at the time of trial was built with the United States paying approximately 50% of the purchase price. With respect to the original Farrell Lines ships alone, the sum of United States assistance equals $133,148,960.

**32.** Under Title XI of the Merchant Marine Act of 1936, as amended (46 U.S.C. §§ 1271–1281), the United States guarantees the payment of bonds or notes issued to defray that portion of the ships' purchase price not paid pursuant to a construction differential subsidy. Furthermore, the United States pledges its full faith and credit for the payment of both principal and interest under its guarantee obligations. 46 U.S.C. § 1273.

**33.** Such routes must be "determined by the Secretary of Commerce to be essential for the promotion, development, expansion and maintenance of the foreign commerce of the United States . . . ." 46 U.S.C. § 1121(a). *See also* 46 U.S.C. § 1171. Farrell cannot operate any of its ships on routes other than those listed in its contract without the approval of the Secretary of Commerce. Any alteration in routes on which Farrell ships sail requires the approval of the United States. Changes in shipping schedules likewise require government approval. The United States also determines when the operator will replace vessels.

**34.** Pursuant to 46 U.S.C. § 1131, the Secretary of Commerce has established minimum manning and wage scales, and working conditions for seamen employed on subsidized vessels. 46 C.F.R. Part 255. Manning requirements are included in the Farrell operating differential subsidy contract. In addition to the crew requirements provided for under the Merchant Marine Act of 1936, as amended, the United States extensively regulates the licensing, employment, wages and working conditions of crews employed aboard Farrell ships. The Coast Guard establishes the officer complement required as a minimum on each vessel, and licenses them for the ranks of officers. 46 U.S.C. §§ 221, 222, 223, 224, 226, 228. Before any ship may sail for a foreign port it must file shipping articles, containing, *inter alia,* the agreement of each member of the crew to serve on the vessel and stating the length of the voyage, the amount of wages, and the regulations for conduct on board. 46 U.S.C. § 564. The Coast Guard supervises the execution of these articles. 46 U.S.C. § 565. In addition, the Coast Guard must inspect the crew quarters once each month, or whenever such vessel enters an American port, to determine if they are clean and sanitary and properly equipped. 46 U.S.C. § 660a. The working conditions are extensively regulated. *See, e. g.,* 46 U.S.C. §§ 653, 654 and §§ 666–670, and 673.

**35.** Although Marad may sometimes disregard provisions in a collective bargaining contract for the purposes of computing a subsidy, it is not empowered to overturn provisions of a contract between a fleetowner and statutory employees which are fair, reasonable and bargained for at arm's length. *See American Export Isbrandtsen Lines, Inc. v. United States,* 499 F.2d 552, 576–86, 204 Ct.Cl. 424 (1974) (delineating standard of review Marad must follow where contracts are bargained for under 29 U.S.C. § 159(a)).

**36.** For a background summary of the legislative purpose underlying passage of the Merchant Marine Act of 1970, see Sen.Rep.No.91–1080, wherein the Senate Commerce Committee said, *inter alia,* "The merchant marine has been appropriately termed our fourth arm of defense." *See also* "Marad '77" Annual Report of the Maritime Administration for Fiscal Year 1977, U.S. Department of Commerce, 1978.

factors in some measure account for the greater cost of operating U.S.-flag vessels as compared with operating foreign vessels. Indeed, the nexus between union rights and government subsidy is direct and demonstrable. Consequently, the court finds that there is governmental action. The reasoning of *McQueen v. Druker,* 438 F.2d 781 (1st Cir. 1971), where action by a private landlord of a heavily-subsidized federal housing project was held to constitute state action, applies here. In that case, the court reasoned that:

> at least when a specific governmental function is carried out by heavily subsidized private firms or individuals whose freedom of decision-making has, by contract and the reserved governmental power of continuing oversight, been circumscribed substantially more than that generally accorded an independent contractor, the coloration of state action fairly attaches.

438 F.2d at 784–85 (citations omitted).[37]

In the context of the instant case Congress has recognized that the merchant marine carries out a specific governmental function of vital interest to the national defense.[38] Farrell is a heavily subsidized private firm which has had its decision-making power greatly circumscribed by an extensive governmental regulatory scheme.[39] It is subject to continuing oversight because in order to receive the subsidies on which its survival depends, Farrell must subject basic decision-making regarding, *inter alia,* routes, cargo and working conditions, to Marad approval.[40]

*The Constitutional Rights of Plaintiffs*

█ It is conceded that Congress can deny supervisors the same right to organize that it grants to statutory employees.[41] Therefore, there is no absolute right[42] for supervisors to bargain collectively. Presented here, however, is the issue of whether once an employer agrees to bargain collectively with supervisors and sets the terms and conditions of employment, the supervisors have constitutional rights to exercise in that process. There is at least at the date of this writing, a First Amendment right in the context of collective bargaining to a determination that the union representing the members is, in fact, a majority-chosen union.

█ It is, of course, settled that among the panoply of individual rights protected by the First Amendment is the freedom of association.[43] *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). *See also, Abood v. Detroit Board of Education,* 431 U.S. 209, 233, 97 S.Ct. 1782, 52 L.Ed.2d 261, *rehearing denied,* 433 U.S. 915, 97 S.Ct. 2989, 53 L.Ed.2d 1102 (1977) (and cases cited thereat). Although less commonly conceived, that freedom includes its converse, the freedom *not* to associate, the right *not* to be compelled to join a group of association against one's will. The right to associate and the right not to associate are complementary aspects of the broader freedom subsumed by the concept of liberty. *Cf. Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (freedom of speech includes freedom to refrain from speaking); *Railway Employees Dept. v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956) (by implication).[44]

█ The First Amendment's protection extends beyond its exercise for purely polit-

---

**37.** *See Wahba v. New York University,* 492 F.2d 96, 102 and 103 (2d Cir. 1974).

**38.** See footnote 36.

**39.** See footnotes 30 through 34.

**40.** See footnotes 33 and 44.

**41.** See footnote 15 and text accompanying footnote 15.

**42.** See footnote 43.

**43.** *See Runyon v. McCrary,* 427 U.S. 160, 175, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1975); *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Buckley v. Valeo,* 424 U.S. 1, 15, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

**44.** See *Buckley v. Valeo, supra* at note 43 hereof, for the proposition that the First Amendment freedoms of speech and association are "closely allied." 424 U.S. at 25, 96 S.Ct. 612.

ical purposes; it encompasses association in the economic context. *See e. g. Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); *NAACP v. Alabama, supra*, 357 U.S. at 460–61, 78 S.Ct. 1163. It includes the protection of an individual's right to join with his fellows in a labor organization for the purpose of asserting mutual and collective economic interests. *See N.L.R.B. v. Jones and Laughlin Steel*, 301 U.S. 1, 32, 57 S.Ct. 615, 81 L.Ed. 893, *et seq.* (1937). Where Congress has decided by statute that an overriding governmental interest exists in enhancing the security of unions, the courts have held that such legislation, e. g. authorizing agency shops, is a permissible infringement of the associational rights. *See e. g. Railway Employees' Dept. v. Hanson, supra; International Association of Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1960). These holdings are based on the settled principle that First Amendment rights are not absolute. *CSC v. Letter Carriers*, 413 U.S. 548, 567, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261, *rehearing denied*, 433 U.S. 915, 97 S.Ct. 2989, 53 L.Ed.2d 1102 (1977).[45] In *Abood*,[46] *supra*, Justice Powell said:

> "Neither the right to associate nor the right to participate in political activities is absolute . . . ." *CSC v. Letter Carriers*, 413 U.S. 548, 567 [93 S.Ct. 2880, 37 L.Ed.2d 796] (1973) . . . Nevertheless, . . . a significant impairment of First Amendment rights must survive exacting scrutiny." *Elrod v. Burns, supra*, [427 U.S.] at 362 [96 S.Ct. 2673, 49 L.Ed.2d 547] (plurality opinion); accord, *id.*, at 381 [96 S.Ct. 2673] (POWELL, J., dissenting). "The [governmental] interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest. . . . [C]are must be taken not to confuse the

interest of partisan organizations with governmental interests. Only the latter will suffice. Moreover, . . . the Government must 'emplo[y] means closely drawn to avoid unnecessary abridgment . . . .' *Buckley v. Valeo, supra*, [424 U.S.] at 25 [96 S.Ct. 612]." *Id.*, [427 U.S.] at 362–363 [96 S.Ct. 2673] (plurality opinion).

431 U.S. at *259*, 97 S.Ct. at 1812 (Powell, J., concurring in the Judgment).

Thus, the required balancing is between the seriousness of the restriction on plaintiffs' rights and the governmental interest in leaving the challenged practice intact. On balance, the effect of the defendants' actions here is to impose a union shop agreement on the plaintiffs as a condition of their continued employment. Absent the safeguard of majority representation, the practice is overly and unnecessarily restrictive. In other contexts courts have held that statutorily authorized union security agreements, in conjunction with the statutory requirement[47] that a majority of the affected employees designate their chosen representative, are permissible infringements of the First Amendment right to associate. *See generally, Railway Employees' Dept. v. Hanson*, ("Hanson"), 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), Frankfurter, J. concurring. The Supreme Court in *Hanson, supra*, upheld the constitutionality of Section 2, Eleventh of the Railway Labor Act, 45 U.S.C. § 152, on the ground that the choice of a union shop in furtherance of the goal of labor peace was a permitted exercise of Congressional power under the Commerce Clause, U.S.Const. Article I, Section 8. *Hanson*, 351 U.S. at 233–35, 76 S.Ct. 714. Remarked the *Hanson* court,

> Congress has authority to adopt all appropriate measures to "facilitate the amicable settlement of disputes which threaten the service of the necessary agencies of interstate transportation." *Texas &*

**45.** See also footnote 43.

**46.** In *Abood, supra*, the Supreme Court considered the permissible reach of a Michigan labor statute which contained a majority representation provision. 431 U.S. at 223–24, 97 S.Ct. 1782.

**47.** See e. g. note 28, *supra*.

N.Q.R. Co. v. Railway Clerks, 281 U.S. 548, 570 [50 S.Ct. 427, 74 L.Ed. 1034]. These measures include provisions that will encourage the settlement of disputes "by inducing collective bargaining with the *true representative* of the employees and by preventing such bargaining with any who do not represent them" (*Virginian R. Co. v. Federation*, 300 U.S. 515, 548 [57 S.Ct. 592, 81 L.Ed. 789]) and that will protect the employees against discrimination or coercion which would interfere with the free exercise of *their right* to self-organization and representation. *Labor Board v. Jones & Laughlin*, 301 U.S. 1, 33 [57 S.Ct. 615, 81 L.Ed. 893].

351 U.S. at 233, 76 S.Ct. at 718–719.

The various statutorily authorized union security provisions,[48] have been held constitutional by this reasoning. *See, e. g., Abood v. Detroit Board of Education*, 431 U.S. 209, 225, 97 S.Ct. 1782, 52 L.Ed.2d 261, *rehearing denied*, 433 U.S. 915, 97 S.Ct. 2989, 53 L.Ed.2d 1102 (1977). In *Abood*, which held, *inter alia*, that an agency shop agreement is valid when the members' dues are used for collective bargaining expenses but that individual union members may not be compelled to make expenditures for political purposes with which they do not agree, the court said:

> The designation of a union as exclusive representative carries with it great responsibilities . . . Moreover, in carrying out these duties, the union is obliged "fairly and equitably to represent all employees . . ., union and non-union," within the relevant unit. A union-shop arrangement has been thought to distribute fairly the cost of these activities among those who benefit, and it counteracts the incentive that employees might otherwise have to become "free riders"—to refuse to contribute to the union while obtaining benefits of union

representation that necessarily accrue to all employees.

To compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests. An employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role as exclusive representative. His moral or religious views about the desirability of abortion may not square with the union's policy in negotiating a medical benefits plan. One individual might disagree with a union policy of negotiating limits on the right to strike, believing that to be the road to serfdom for the working class, while another might have economic or political objections to unionism itself. An employee might object to the union's wage policy because it violates guidelines designed to limit inflation, or might object to the union's seeking a clause in the collective-bargaining agreement proscribing racial discrimination. The examples could be multiplied. To be required to help finance the union as a collective-bargaining agent might well be thought, therefore, to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit. But the judgment clearly made in *Hanson* and *Street* is that such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress.

*Id.* at 221–22, 97 S.Ct. at 1792–1793 (citations and footnotes omitted).[49]

██ It does not follow that because an employer is under no compulsion to accord his supervisors the "anomalous status of

**48.** For a general discussion of the various types of union security agreements, see R. Gorman, *Basic Text on Labor Law Unionization and Collective Bargaining* (1976), Ch. 28.

**49.** The case law discussion of the rights of individuals with respect to political expression in the text accompanying this footnote presupposes that the union is the proper representative to assert a collective economic position and then elaborates the dissenters' rights. *See generally* Comment, The Regulation of Union Political Activity: Majority and Minority Rights and Remedies, 126 *U.Pa.L.Rev.* 386 (1977).

employees," [50] and thus may fire them if they join a union, that supervisory employees have no rights to select their representative by majority vote when and if the employer elects to and does recognize a union of supervisors. Here, the defendants argue that *Hanna Mining Co. v. District 2, Marine Engineers Beneficial Ass'n., AFL–CIO*, 382 U.S. 181, 86 S.Ct. 327, 15 L.Ed.2d 254 (1965) and *Beasley v. Food Fair of North Carolina, Inc.*, 416 U.S. 653, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1973), mandate a holding that BMO licensed deck officers, no matter by how much they outnumber their MMP counterparts, must either accept MMP or lose their jobs, being devoid of any protection under the Act. The *Hanna* Court dealt with a union's efforts to unionize supervisors, and held, *inter alia*, that "activity designed to secure organization or recognition of supervisors cannot be protected by § 7 of the Act" 382 U.S. at 188, 86 S.Ct. at 331. In *Beasley* the Court held that supervisors, who are not protected by the Act, cannot be awarded damages for discharge by their employer. Neither case is based upon either an alleged constitutional right or the concept of majority representation. Moreover, unlike the instant case, the employers involved in *Hanna* and *Beasley* had not recognized the relevant union nor bargained with it. Therefore, these cases do not bar a holding that under the First Amendment plaintiffs are at least entitled to have their representative chosen by a majority vote, irrespective of whether they may be required to join a union as a condition of employment. The majority representation principle as it is reflected in statutes [51] and case law [52] constitutes a fundamental right in the labor relations context.

*Relief*

As indicated above, plaintiffs have been determined to be entitled to a declaration that representation by a union, not majority selected, constitutes a violation of their First Amendment rights. However, the protection of those rights should not result in the immediate disruption of the relationship between Farrell and MMP.

The relief here granted to enforce plaintiffs' constitutional rights will be analogized to the relevant practice which is followed with respect to statutory employees who are "covered" by the NLRA.

Plaintiffs represented in open court that an election might not be the only way to determine which union has majority status. If the parties are able to agree on a process, such as union card authorization, which would establish the majority status of the unions involved, such process would be satisfactory to this court, for as the Supreme Court has indicated in *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 597, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), *quoting from United Mine Workers v. Arkansas Flooring Co.*, 351 U.S. 62, 76 S.Ct. 559, 100 L.Ed. 941 (1956) when the NLRA applies,

"Board election is not the only method by which an employer may satisfy itself as to the union's majority status," 351 U.S., at 72, n.8, [76 S.Ct. 559], since § 9(a), "which deals expressly with employee representation, says nothing as to how the employees' representative shall be chosen," 351 U.S., at 71, [76 S.Ct. 559.]

395 U.S. at 597, 89 S.Ct. at 1931.[53]

In the event that the parties fail to agree on such a process, the statutory rules and National Labor Relations Board regulations relating to decertification proceedings will

**50.** S.Rep.No.105, 80th Cong., 1st Sess. (1947) at 5, *quoted* in *Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 662, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974).

**51.** *See, e. g.*, 29 U.S.C. § 159(a), as quoted in footnote 28 hereof.

**52.** *See N.L.R.B. v. Allis Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123, *rehearing denied*, 389 U.S. 892, 88 S.Ct. 13, 19

L.Ed.2d 202 (1967); *Labor Board v. Jones & Laughlin*, 301 U.S. 1, 33, 57 S.Ct. 615, 81 L.Ed. 893 (1937).

**53.** In *Gissel, supra*, the Supreme Court held *inter alia*, that a union could establish a bargaining obligation by means other than a National Labor Relations Board election. 395 U.S. at 596–97, 89 S.Ct. 1918.

constitute a vade mecum for the court.[54] This declaration should therefore not serve to dislodge the present status quo or to alter the existing contractual terms and conditions of employment. If it is subsequently determined that MMP is not supported by the majority of the personnel in the relevant fleetwide unit, then, and only then, will it be determined that plaintiffs' constitutional rights, here declared, have been violated.

The plaintiffs are directed to submit a judgment consistent with this opinion, on notice, to the clerk of this court within 14 days hereof.

IT IS SO ORDERED.

---

**54.** As stated by the Supreme Court in *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946): "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done."

*Id.* at 684, 66 S.Ct. at 777 (footnotes omitted).